STATE v. SELLA FREEMAN and JAMES LOWE.

(Decided March 1, 1898).

*Indictment for Murder—Homicide—Aiding and Abetting—Trial—Sufficiency of Evidence—Verdict—Discretion of Jury as to Finding.*

1. In the trial of an indictment for murder it was admitted that one J killed the deceased and it appeared in evidence that, just prior to the killing, the defendants went with J to the house of the deceased where J, in the presence and hearing of the defendants, cursed and threatened the life of the deceased's wife; that then J went into the house, got two guns of the deceased, carried them to the kitchen, met the deceased at the gate and in the sight and hearing of the defendants shot and killed the deceased as the latter approached the gate; that the defendants made no attempt, by word or act, to prevent the killing, made no outcry but, without saying anything, walked away with J; that a short time before the killing a witness had a conversation with the defendants and one of them said that J had sent for deceased to come over and compromise a

STATE *v.* FREEMAN.

difficulty between the latter and J. and that J had loaded his gun and was going to shoot deceased if he did not settle; that one of the defendants asked witness for cartridges for his pistol, saying, "I am afraid we are going to have trouble with J to-day;" that on the day of the killing J came to the house of defendant F without a gun, and the two then went away together, (F going voluntarily) and in twenty minutes witness heard two guns fired over at the deceased's house, and when they came back J said he had killed the deceased and witness remarked, "If the deceased is killed it will go hard with all of you"; *Held,* that the evidence was sufficient to sustain not only a verdict of murder in the second degree, but, if believed, would have justified the jury in finding that the defendants were present, aiding and abetting J and, therefore, guilty of murder in the first degree.

2. It is not in the discretion of the jury to render a verdict of murder in the first or second degree, since the degree depends upon the facts as the jury find them to be and applying thereto the law as laid down by the Court.

3. The defendants cannot, on appeal from a conviction complain of an erroneous instruction which was not prejudicial to them but in their favor.

4. When upon an indictment for murder a conviction is had for a lesser offence, if upon appeal a new trial is granted, the case goes back for trial for the full offence charged in the indictment.

INDICTMENT for murder tried before *Brown, J.,* and a jury at Fall Term, 1897, of HERTFORD Superior Court. The defendants were convicted of murder in the second degree and appealed. The facts appear in the opinion.

*Mr. Zeb V. Walser, Attorney General,* and *Messrs. Geo. Cowper* and *L. L. Smith,* for the State.

*Messrs. Winborne & Lawrence* and *Shepherd & Busbee,* for defendants (appellants).

CLARK, J.: The prisoners in apt time requested the court in writing (*Code,* Sections 414 and 415) to charge that the evidence was not sufficient to establish the guilt of the accused for any offence; declined and prisoners excepted. The court charged the jury among

other things that "if they should find from the evidence
that the prisoners at the bar and Prince Jernigan went
to the house of the deceased in pursuance of a precon-
certed arrangement to go together to the house of the
deceased and pick a quarrel with him, and if he resisted
that Jernigan should kill him, and if the jury should
further find that the prisoners were present for the pur-
pose of aiding and abetting Jernigan in carrying out
any such preconcerted and prearranged agreement, if
any was made, it would be murder in the first degree."
Prisoners excepted.    The proposition of law laid down
is correct and the exception can be based only on the
ground taken in the first exception above, *i. e.*, that
there was not sufficient evidence to submit the case to
the jury as to the prisoners (Freeman and Lowe) so that
in effect there is but this one exception, and all other
exceptions were abandoned, and properly so, in this
court.

It was admitted that Prince Jernigan killed the
deceased. It was in evidence that Jernigan, and the
prisoners Freeman and Lowe came to the house of the
deceased together, that Jernigan (a colored man) cursed
the wife of the deceased and threatened her life,
and then went into his house, got the two guns
of the deceased, carried them to the kitchen, met
the deceased at the gate and shot him as he came
in. Freeman and Lowe were present and said
nothing and after the killing they walked off in company
with the murderer; they came up in company with
Jernigan when he said to the wife of the deceased that
he was going to kill the whole family and burn the
house, and they saw Jernigan go to the gate, gun in
hand, to meet the husband whom he had threatened to
kill, but they said nothing. Jernigan had a gun in his

hand when he came there with the prisoners, threaten-
ing to kill.

It was further in evidence by one Hoggard that the
Sunday before the killing he had a conversation with
Freeman and Lowe about some difficulty as to cattle of
deceased breaking into a field, and Freeman said that
Jernigan had sent for the deceased to come over and
compromise the fuss about the cattle.    Freeman further
said that Jernigan had loaded his gun and was going
over and shoot the deceased if he did not settle the
fuss.    Freeman pulled out his pistol and asking the wit-
ness if he had any cartridges to fit it, said "I am afraid
we are going to have trouble with Jernigan to-day,"
and the witness suggested that Jernigan might kill, and
Freeman had better have him arrested, but he declined
to do so.    The witness went to Freeman's house on the
day of the killing.    Jernigan came up without a gun,
and he and Freeman went off together—Freeman to all
appearances going voluntarily, and in 20 minutes the
witness heard two guns fire over at the house of the
deceased.    Jernigan and Freeman came back together
and Jernigan said he had killed the deceased; witness said
to Freeman, "if the deceased is killed it will go hard with
all of you."    Freeman made no reply.    Freeman said
that on the way to the house of the deceased, Jernigan
pulled his gun out of a tree top and called to the men to
go with him to the deceased to compromise the trouble;
and the witness testified that when Jernigan passed the
corner of the house, with two guns, and told deceased
to "come into the yard and talk to his boss men or
damned if he would not kill him," Freeman and Lowe
were standing where they could see Jernigan but they
did not attempt to stop him, and made no outcry.
After the killing, Jernigan said something to Freeman

and Lowe, and the three went off together. Jernigan had two guns and shot the deceased. He carried away both guns. Freeman and Lowe made no attempt to stop or interfere with Jernigan. They saw Jernigan reload his gun.

The prisoners, who seem to be white men, rely upon the plea that they were afraid of Jernigan. What credence or effect should be given to such defence was for the jury. Certainly, taking the evidence in the aspect most favorable to the State, as must be done on a prayer to instruct the jury that there was no evidence, there was not only sufficient evidence to sustain the verdict, which was rendered, of murder in the second degree, but if believed it would have justified the jury in finding that Freeman and Lowe were present, aiding and abetting, and therefore guilty of murder in the first degree.

The Court further instructed the jury that it was "in their discretion under the statute, as construed by our Supreme Court, to render a verdict of murder in the second degree." This instruction was erroneous and not warranted by any decision of this Court, but it is an error in favor of the prisoners and cannot be complained of by them. It is probably due to it that they were not convicted of murder in the first degree, indeed they should congratulate themselves that we find no error committed prejudicial to them, since, if the case were sent back for a new trial, it would be had for the offence of murder in the first degree as charged in the indictment. *State* v. *Groves*, 121 N. C., 563; *State* v. *Craine*, 120 N. C., 601; *State* v. *Grady*, 83 N. C., 643, 649; *State* v. *Stanton*, 23 N. C., 424. His Honor's error was doubtless based upon a misconception of *State* v. *Gadbury*, 117 N. C., 811, but that case does not hold

STATE *v.* FREEMAN.

that a jury has the discretion to render a verdict for murder in the first or second degree. Upon the authorities, the degree of murder depended upon the facts as the jury find them to be and applying the law laid down by the Court to that state of facts. *State* v. *Fleming*, 107 N. C., 905; *State* v. *McNight*, 111 N. C., 690; *State* v. *Gilchrist*, 113 N. C., 673; *State* v. *Covington*, 117 N. C., 834. In *State* v. *Gadbury*, this principle was not overruled but the Court held that the killing with a deadly weapon being shown, the law did not now, as formerly, presume murder in the first degree but only murder in the second degree, and that the burden being upon the State to go further and show deliberation and forethought, the Court should not have instructed the jury that if they believed the evidence in that case they should find the prisoner guilty of murder in the first degree—that, as the jury is to determine the degree of murder, it was for the jury, not the Court, to find from the evidence whether there was the premeditation which would raise the killing from murder in the second degree (presumed from the killing with a deadly weapon) to murder in the first degree.

Affirmed.