STATE v. GEORGE W. DANIELS.

(Filed March 22, 1904).

1. HOMICIDE—*Premeditation and Deliberation—Questions for Jury—*
*Questions for Court—Acts 1893, ch. 85—Intent.*

In a prosecution for homicide, whether certain evidence shows pre-
meditation and deliberation is a fact to be found by the jury,
and not a conclusion of law to be drawn by the court.

CLARK, C. J., dissenting.

INDICTMENT against George W. Daniels, heard by *Judge
George H. Brown* and a jury, at November Term, 1903, of
the Superior Court of DUPLIN County. From a verdict of
murder in the first degree, and judgment thereon, the de-
fendant appealed.

*Robert D. Gilmer, Attorney-General,* and *Charlton & Wil-
liams,* for the State.
*Stevens, Beasley & Weeks,* for the prisoner.

CONNOR, J.   The prisoner was charged with the murder
of one Maxwell, and from a conviction of murder in the
first degree, and the judgment thereon, appealed. The
prisoner's counsel requested several prayers for special in-
structions, all of which were refused. In the view we take
of the case, it is unnecessary to pass upon the exceptions to
his Honor's refusal to give them. There was, besides the
prisoner, but one eye-witness to the homicide. Rufus
Stroud, introduced by the State, testified that he saw Max-
well alive last in the woods dipping turpentine. George
Daniels shot him; he saw the prisoner standing in the path,
the deceased standing by the side of a pine; the prisoner
asked the deceased why he went to his house last night, and

the deceased said he did not go; the prisoner said, "You are a damned liar, you did; I am going to kill you; throw up your right hand." The prisoner then shot him, he was in about ten or eleven steps from the deceased; shot once. When he shot, the witness ran off; the deceased ran to him and said "I am shot." He died in a short time. The deceased was about three feet from the prisoner when shot, and had a turpentine dipper in his hand. There was evidence on the part of physicians that the deceased died from wounds inflicted by the prisoner.

The prisoner testified in his own behalf that he was at his tobacco barn the night before the homicide; that he left there that morning about sunup; Susan Whaley and Hannah and their children stayed with him from midnight till he left; all started to the prisoner's house; he told Susan to prepare breakfast; the night before he had taken his gun to the tobacco barn, and as he passed by the barn, going down the path, he stopped and shot the gun; went down the path toward the Pink Hill road calling the women; had started to George Turner's where they said they were going; was going along the path about fifty yards from the fence, saw the deceased, he was about forty yards in the woods from the road, was standing on one knee on the ground and one hand on a log; did not know he was in the woods at this point; was calling Susan and Hannah as loud as he could; some one said "What is the matter?" Looked in the direction of the voice, and the deceased arose and said "What do you want?" he said "I want my people." The deceased said "You shan't have them, I will protect them." The deceased was coming towards the prisoner with a dipping iron in his hand (a piece of flat iron twelve inches long and nearly one inch thick to a point, and handle five feet long). The deceased said that the prisoner had been talking about him; he was very mad. The prisoner said, "Will, if you don't

quit coming on me, I will shoot you." He said, "shoot, shoot"; was then about ten or fifteen steps off, and had about stopped when the prisoner shot; had the dipper in one hand up against the tree, and with his hands spread out against two trees; he was not in striking distance, making no effort to strike the prisoner with the dipper; had no previous difficulty with the deceased. The prisoner was looking "for his folks"; snapped the gun at him before it fired; the prisoner had not seen the deceased before on that morning, did not know where he was, did not know whether the women were in the woods. The prisoner and the deceased were perfectly friendly, had not had any difficulty, and was not mad with him; when he shot, was "scared" of him, he weighed about 140 pounds. "I shot him because I was scared of him with the dipper coming towards me; was on good terms with him; never went there to shoot him, did not expect to see him." The prisoner ran off and went to Jim Maxwell's and told him he had shot Will Maxwell, and he asked him why, and he told him that "Maxwell was coming with a turpentine dipper at me"; told several others; went to Stroud and surrendered; "told him to take me in charge." There was much testimony in regard to the prisoner's mind before and after the homicide. Several witnesses described his conduct and expressed the opinion that he was crazy, some of the witnesses saying that "he was insane." Doctor Smith, who heard the testimony, gave it as his opinion that "he was not insane." Doctor Kennedy testified that he had known the prisoner four years, and had heard the testimony: "From the evidence of the witnesses, and my previous knowledge of him, I would not say he was bright; I think he was crazy from the way he did and the way he acted." The prisoner excepted specially to portions of the charge. The only exception which we deem it necessary to discuss is to the following instruction:

134——43

The Court stated to the jury that only two persons have testified that they were eye-witnesses to the homicide; the one is the prisoner and the other is Rufus Stroud. The Court then read the evidence of Rufus Stroud, and charged the jury that "If you find those facts to be true, beyond a reasonable doubt, the prisoner is guilty of murder in the first degree, because they show premeditation and deliberation upon the part of the prisoner."

There was evidence proper to be submitted to the jury to show premeditation, and, if believed by them, to justify the verdict of murder in the first degree. Hence, there was no error in the refusal of his Honor to instruct the jury as prayed by the prisoner in that respect.

The sole question therefore to be considered is whether his Honor was correct in saying to the jury that if they found the facts to be as testified by Stroud, "the prisoner is guilty of murder in the first degree, because they show premeditation and deliberation." Whether an act is the result of premeditation and deliberation is a fact to be found by the jury, and not a conclusion of law to be drawn by the Court. In *State v. McDonald,* 133 N. C., 680, *Mr. Justice Walker,* writing for the Court, said: "When an act becomes criminal only by reason of the intent, unless the intent is proved the offense is not proved, and this intent must be found by the jury as a fact from the evidence. It is for them to infer, and not for the Court." The authorities cited in the opinion fully sustain and illustrate the principle. It may be that, as an inference to be drawn by the jury, we should not hesitate to say that they came to a correct conclusion. In the light of the charge they were not permitted to draw an inference, but, upon finding the account of the homicide to be true as testified by Stroud, it became their duty, and they were required, as a conclusion of law, to find the prisoner guilty of murder in the first degree. Assuming that

the jury followed his Honor's instruction, and "took the law from the Court," as it was their duty to do, they did not consider, pass upon or decide the question of fact, the existence of which is an essential element in the crime charged. They did not, and could not, inquire whether the act was premeditated. The case as presented may be likened unto a special verdict in which the question is submitted to the Court, as one of law, whether upon the facts found there was premeditation. The statute (Acts 1893) declares that the jury must fix the degree of murder. To do this they must find the fact that the murder was committed either by means of poisoning, lying in wait, imprisonment, starving, torture, or by wilful, deliberate and premeditated killing, or in the perpetration, or attempt to perpetrate, certain enumerated crimes, or other felony. The Judge should instruct the jury what constitutes lying in wait   *   *   *   or premeditation, but he may not go further and instruct them, as a conclusion of law, that certain facts show premeditation.

*Mr. Justice Douglas,* writing for the Court in *State v. Booker,* 123 N. C., 713, said: "When the circumstances of the killing do not bring it within the classes which by the statute are made *per se* murder in the first degree, the State must prove deliberation and premeditation, but this may be done by circumstances and not necessarily by express and positive evidence."

·  It will be observed that the statute classifies murder in the first degree:

1. By poisoning, lying in wait, etc.; herein the State is not required to prove premeditation, because the manner of doing the act necessarily involves premeditation. The presumption is made, by the statute, irrebutable. When committed in either of the methods mentioned, it is *per se* murder in the first degree. A person who lays poison for or waylays

or tortures another unto death will not be heard to say that he did not premeditate.  *State v. Gilchrist,* 113 N. C., 673.

2. In the perpetration, or attempt to perpetrate, a felony: Herein it is not necessary to show premeditation.  The killing under these conditions, although without premeditation, is declared to be murder in the first degree.  *State v. Covington,* 117 N. C., 834.

3. By wilful premeditation and deliberation: The line which separates felonious homicides committed otherwise than as defined in the foregoing classes, without premeditation, from those accompanied by the additional mental condition, called premeditation, is shadowy and difficult to fix. The law cannot safely prescribe any uniform and universal rule in regard thereto.  As in questions of negligence and the like, it can only define the term and submit the question of its existence to the jury.  It is well settled that the state of mind, intent, sanity, etc., is always a question of fact for the jury.  The principle is well stated by the present Chief Justice in *State v. Freeman,* 122 N. C., 1012: "The degree of murder depends upon the facts as the jury find them to be, applying the law laid down by the Court upon that state of facts.  *  *  *  As the jury is to determine the degree of murder, it is for the jury, not the Court, to find from the evidence whether there was the premeditation which would raise the killing from murder in the second degree (presumed from the killing with a deadly weapon) to murder in the first degree."  This case comes clearly within the third class—there was no lying in wait."

"Whenever the degree of the offense depends upon the particular intent with which an act is done, the intent to be inferred from the circumstances is for the jury, and every fact which will throw light upon that question may be given in evidence."  *Filkin v. The People,* 69 N. Y., 101, 25 Am. Rep., 143.

*Danforth, J.,* in *McKenna v. The People,* 81 N. Y., 360, says: "Whether this intent existed could not be a question of law. It was necessarily to be determined by the jury from all the facts and circumstances of the case, and if not found the prisoner could not be convicted.  *  *  *  The charge as given may well have been understood by the jury as involving an opinion of the Court upon this as well as other elements of the crime.  *  *  *  Instead of informing the jury what must be established to make out the offense, and leaving it to them to determine whether it had or had not been done, the Judge says, 'enough has been proved, if you believe the witnesses on the part of the people.' Their attention is directed to evidence of inculpation merely; its weight is stated to them as sufficient in law to sustain a conviction for the grave offense; so that the question of fact, to which their minds have been turned, relates to the credibility of certain witnesses, and not to the weight or measure of their testimony, or the existence of the intent. How far that testimony was modified or neutralized by that produced by the prisoner, or what inferences should be drawn from any of it, is virtually excluded from their inquiry."

While his Honor correctly instructed the jury in regard to the suggestion of insanity or intoxication as relieving the prisoner from responsibility, it may be that if the jury found that the homicide was committed in the manner and under the circumstances testified by Stroud, they would, if permitted to consider the entire evidence, have found in the testimony regarding the prisoner's peculiar behavior before and after the killing, sufficient evidence to create a reasonable doubt as to the question of premeditation. They may, in this view, have reached the conclusion that while the evidence in his behalf did not rebut the presumption of malice raised by the law from the use of a deadly weapon, it did create a reasonable doubt whether the prisoner was

capable of premeditating and deliberating. However this may be, they were entitled, and it was their duty, to consider all of the evidence, and find all of the essential facts before arriving at their verdict. The prisoner, however guilty, is entitled to be tried by "the ancient mode' of trial by jury," in which the Court decides all questions of law, and the jury all questions of fact. "The jury are the constitutional judges not only of the truth of testimony, but of the conclusions of fact resulting therefrom," *Henderson, J.,* in *Bank v. Pugh,* 8 N. C., 198. For the error in the instruction there must be a new trial.

We concur with his Honor's ruling upon the motion to set aside the verdict for improper conduct on the part of the father of the deceased and of some of the jurors. We are quite sure that his Honor felt, as we do, that such conduct was exceedingly improper and calculated to shake confidence in the integrity of the verdict, so far, at least, as one of the jurors was concerned. The absolute, unquestioned and unquestionable integrity of jurors in basing their verdicts upon the law and the evidence is of such vast and vital importance to suitors and people, that any conduct which casts upon it the slightest suspicion merits severe condemnation from the Courts. While the ancient custom of keeping the jury in close confinement "without meat or drink" has been abandoned, we should be careful to see to it that while empaneled, and, in a way, set apart from the public, to true deliverance make between the State and the prisoner, the strictest vigilance be had to protect them from suggestions or approach by interested persons. The conduct of the father of the deceased was calculated to arouse suspicion that he desired to exert some influence over some of the jurors. The Judge cannot, in the discharge of his duties, keep a jury at all times in his presence, and is directed to place them in charge of a sworn officer. It is the duty of the officer to promptly

report to the Judge any improper conduct on the part of jurors or other persons in this respect. Judges are often embarrassed to find, after long and expensive trials, verdicts in capital cases brought into question by improper conduct of the jury, often the result of thoughtlessness, too frequently not so easily explained. While we approve the course pursued by his Honor, we feel, in view of the frequency with which these questions are brought to our attention upon appeals, that it would be well to enforce the law by punishment for contempt, questionable conduct by or towards jurors while engaged in the trial of capital felonies.

New Trial.

CLARK, C. J., dissenting. The entire evidence, except that of the prisoner himself, is that of Stroud, who testified that he "saw the prisoner standing in the path, the deceased standing by the side of a pine, the prisoner asked the deceased why he went to his house last night, and the deceased said he did not go, the prisoner said 'you are a damned liar, you did,' I am going to kill you, throw up your right hand. The prisoner then shot him, he was in about ten or eleven steps from the deceased, shot once. When he shot, the witness ran off; the deceased ran to him and said 'I am shot.' He died in a short time." The Court read the above testimony to the jury and told them, "If you find those facts to be true, beyond a reasonable doubt, the prisoner is guilty of murder in the first degree, because they show premeditation and deliberation upon the part of the prisoner." In this there could be no error, for if, under those circumstances the prisoner said, "I am *going to kill you,* throw up your right hand," and then shot and killed, there was premeditation and deliberation. There was the declaration of the intention to kill, the ordering the deceased to throw up his hands, and then the aiming, firing and killing. That the

deliberate purpose is formed, for however brief a period before the killing, is sufficient under all our authorities. *State v. Dowden,* 118 N. C., 1145; *State v. Foster,* 130 N. C., 666, 89 Am. St. Rep., 876, and many others. Here, if the evidence is believed, the purpose was not only formed but announced by the prisoner. When premeditation is an inference to be drawn from other facts, it is for the jury. But when the jury find that the prisoner announced his intention to shoot and ordered the deceased to hold up his hands, and that then, without provocation, the prisoner did fire and kill, there is no inference to be drawn. The jury find the fact of premeditation when they find that the prisoner announced his intention already formed to kill and then without provocation does kill. Authorities can be cited, but no ruling of any Court could add force to this simple statement of the facts which the jury found to be true.