The prisoner was convicted of murder in the first degree. There is no exception to the evidence nor to the charge, except that the court *Page 824 
permitted the jury to consider the question of murder in the first degree. The case on appeal states: "The prisoner excepted to the judge's permitting the jury to consider murder in the first degree on the ground that there was no evidence, as he claimed, or murder in the first degree, therefore the judge's charge is not sent up in full. The court in its charge among other things, instructed the jury fully and correctly as to what in law constituted murder in the first degree, murder in the second degree, and manslaughter, and that under the evidence they could render one of four verdicts: murder in the first degree, murder in the second degree, manslaughter, or not guilty, as they found the facts to be, applying the law as stated by the court and fully and correctly placed the burden upon the State of proving beyond a reasonable doubt each fact to constitute the prisoner's guilt."
The prisoner offered no evidence. The evidence for the State is that the body of Lala Lassiter was found Thursday, 10 May, 1917, in the woods in Garris' Field. Her throat was cut from ear to ear and she had been hit a hard blow on the head and her nose was broken in, and a club near-by had a knot with blood on it which corresponded with the break in the nose, and there was a cut on her finger. There was also evidence that a knife or razor had been wiped on the grass. When found, the body had evidently lain in the woods for two or three days, during which time there had been rain, which demoved [removed] many evidences of the transaction. Her clothing was much disarranged, her dress being up to her knees, and also on her back. There was evidence that she did not know the prisoner, who is a negro boy.
On the Monday preceding the finding of the body, the deceased was seen going on foot from her home to Conway and returning and the prisoner driving his wagon was just behind her. She was not seen again until her dead body was found. This wagon had stopped not far from where the murder occurred for about an hour, and while it was stopped a woman was heard screaming and hollering about the spot where the murder occurred. The team and wagon stood there about an hour (779) with no one in attendance. There was evidence that the tracks were found in the ditch, and the shoes which were taken from the prisoner exactly fitted the tracks at the place where the body was found. C. J. Garris also testified that when he went to help arrest the prisoner, the prisoner saw him coming and ran. Thad Davis testified to having seen the defendant in possession of a knife which he claimed to be his own, and Garris testified that he found a lot of leaves which had wiped a knife blade and looked like the knife blade had been run through them. The doctor testified that the throat of the deceased had been cut from ear to ear, probably with a knife or razor, cutting the jugular vein. *Page 825 
The deceased was a married woman and was returning to her home along the road that ran through this field. On the Wednesday after the Monday the prisoner came to Sam Flythe and tried to borrow a shovel. The prisoner was seen on the other side of the fence coming from the ditch, back of which the body of the deceased was found, at the time that the team had stood idle in the road about an hour. Two witnesses testified to having heard a hollering in that field about that time. Mrs. Munford testified that it was a screaming and hollering, and it was a woman's voice in distress. Two witnesses testified that the tracks leading to the scene of the murder fitted the shoes of the prisoner exactly, both the left shoe and the right, "A mold would not have fitted better." At places where the ground was hard there were no tracks, but leaves had been broken off. In one place the witnesses found buds pulled off, and it looked like lots of them had been wiped on the hands. When the prisoner was arrested in Courtland, Va., the tracks made by him fitted the same shoes that fitted these tracks. He ran, but was caught high up in a tree. The sheriff said he made no threats and asked no questions, but when the prisoner got down he said: "You are after me for killing that woman," and added that he did not do it. The sheriff testified that he asked the prisoner where he was when his team was standing in the road, and he replied that he went back to Pete Joyner's, to which the sheriff asked him. "You did not do that, for they said you did not go there that morning." Sheriff Joyner also testified: "Charles Garris pointed out the tracks to me. He fitted one shoe and I fitted the other. We found tracks that were staked off; they were in the field; these tracks extended across that plowed field. We fitted these shoes for 150 yards and they fitted the tracks exactly. The tracks we put these shoes in were distinct. There was absolutely no mistake about that. The tracks had gone deep enough to rain there. My recollection is that these tracks were coming from the woods in which we found the body."
Mr. Bridgers testified that he was with Sheriff Joyner and Garris when they searched for the tracks. "We did not find any tracks until we got to the first opening. (The witness here explains the (780) map, showing where the body was found.) We found leaves there that looked like they had been bruised or something drawn through them, and had what looked like blood on them. We examined the piece of wood it is supposed she was hit with. We noticed something that looked like blood on the knot. We saw some bushes that were broken; some bruised down, and picked up many of the leaves, which compared with those that were broken from the bushes along where something seemed to have been dragged." *Page 826 
J. P. Garris testified that he was with the party who went to arrest the prisoner before he left the State; when the prisoner saw them he whipped up his mule and went pretty fast, going through two gates; when his party jumped out of the automobile and started for the prisoner, the prisoner jumped off the wagon and went into the woods; that they had not let this man know that they were coming after him; that the tracks they saw in Southampton County, Va., when they caught the prisoner were the same as those in the field where this body was found. The husband of the deceased testified that when his wife did not return Monday he thought she had gone to her mother's.
Our statute of 1892, now Rev., 3361, provides: "A murder which shall be prepetrated [perpetrated] by means of poison lying in wait, imprisonment, starving, torture, or any other kind of willful, deliberate, and premeditated killing, or which shall be committed in the perpetration of or attempt to perpetrate any arson, rape, robbery, burglary, or other felony, shall be deemed to be murder in the first degree and shall be punished with death. All other kinds of murder shall be deemed murder in the second degree."
It has been repeatedly held by this Court that the deliberation and premeditation need not be of any perceptible length of time. S. v. Jones,145 N.C. 466; S. v. Banks, 143 N.C. 652; S. v. Daniel, 139 N.C. 549.
"It is not essential in order to show prima facie premeditation on the part of the prisoner that there should be evidence of preconceived purpose to kill formed at a time anterior to the meeting when it was carried into execution. It is sufficient if the prisoner deliberately determined to kill before inflicting the mortal wound. If there were such purpose deliberately formed the interval, if only a moment, before its execution is immaterial." S. v. McCormack, 116 N.C. 1033, where it is also said, approving Kerr on Homicide, sec. 79: "The question (781) whether there has been deliberation is not ordinarily capable of actual proof, but must be determined by the jury from the circumstances. It has been said that an act is done with deliberation, however long or short a time intervenes after the intent is formed and before it is executed, if the offender has an opportunity to recollect the offense."
In S. v. Booker, 123 N.C. 713, there was evidence which, in the language of the Court, "tended to show that the prisoner went to the *Page 827 
home of the deceased on the morning of the day she was killed and got some black pepper; that he went off, and came back in about an hour with a gun and without provocation shot the deceased in the back of the head killing her instantly." The Court in that case adopted the words of the Court inPeople v. Conray, 97 N.Y. 72: "We are of the opinion that the jury was justified in inferring from the facts and circumstances proved that the death of the deceased was the result of deliberation and premeditation."
In S. v. Adams, 138 N.C. 697, the husband of the murdered woman on his return home found his wife dead in the cotton field near the house with her skull crushed. There was evidence in that case, as in this, of the prisoner's tracks leading to and from the dead body. The Court said: "Murder may be committed without any motive. It is the intention deliberately formed, after premeditation, so that it becomes a definite purpose to kill. And a consequent killing without legal provocation or excuse constitutes murder in the first degree. The existence of a motive may be evidence to show the degree of the offense, or to establish the identity of the defendant as the slayer, but motive is not an essential, nor is it indispensable to a conviction of the person charged with its commission. S. v. Wilcox, 132 N.C. 1143; S. v. Adams, 136 N.C. 620."
In S. v. Banks, 143 N.C. 652, the Court reiterates the repeated decisions of this Court as follows: "No particular time is necessary to constitute premeditation and deliberation for the conviction of murder in the first degree under the statute, and if the purpose to kill has been deliberately formed, the interval which elapses before it execution is immaterial."
In this case, there is evidence that the deceased was walking along the road in front of the wagon driven by the prisoner; that he stopped his wagon, which stood idle for about an hour; that during that time a woman was heard screaming where the body was found, and at the end of that time he was seen returning from that direction; that tracks leading to and from that direction and also near the body were identified as fitting the prisoner's shoes; that the victim's throat was cut from ear to ear, her head bruised up, her nose broken in and a knot on a club nearby had blood on it and fitted the indentation on her nose; that the prisoner was known to have a knife and the (782) grass showed that a knife had been wiped upon a bunch of it. There was indications that the body had been dragged through the bushes and that leaves and grass had been bent down; and that buds and leaves from the trees had been pulled off as if some one had wiped his hands; when a party went to arrest the prisoner, he whipped his *Page 828 
team and endeavored to escape, but finally jumped off his wagon and ran through the woods. Under extradition proceedings officers were sent who found him in Virginia. Seeing the party approaching the prisoner again fled and when overtaken was up a tall tree. When he came down before any charge was made the prisoner said, "You have come to arrest me for killing that woman," and denied it.
The evidence is circumstantial. It was for the jury to say whether the prisoner committed the homicide. There was evidence from the above testimony, taken in connection with the disordered state of the dress of the victim, that the homicide might have been committed in an attempt to rape which would make it murder in the first degree. There was an absence of any altercation or quarrel which might point to a killing with malice and without deliberate intent to kill. The manner of the killing, cutting the throat from ear to ear, the beating up of the head and the breaking in of the nose would indicate, or at least was evidence from which the jury could infer that the killing was not merely from malice (which would make it murder in the second degree), but was a deliberate intent to kill in order to conceal his crime or his intent to commit crime, against the person of the victim. These were matters for the jury.
In Hill v. Commonwealth, 2 Grattan (Va.), 594, it is held: "Where a homicide is proven, the presumption is murder in the second degree. If the Commonwealth would elevate it to murder in the first degree, it must furnish evidence to justify such finding, and if the prisoner would reduce it to manslaughter, the burden of proof is on him. A man shall be taken to intend that which he does, or which is the immediate or necessary consequence of his act. A mortal wound given with a deadly weapon, in the previous possession of the slayer, without any or upon very slight provocation, is prima facie willful, deliberate, and premeditated killing, and throws upon the accused the necessity of proving extenuating circumstances. This is quoted and followed in Longley v. Commonwealth, 99 Va. (December, 1900), 807, and is also quoted and followed in S. v. Welsh,36 W. Va. 690, and the same doctrine is well established in other Courts. There could hardly have been any provocation to cause the beating up a woman and cutting her throat from ear to ear but the deliberate intent to kill.
(783) If this evidence satisfied the jury that the prisoner committed the homicide, the attendant circumstances of the killing by cutting her throat from ear to ear, beating her head, and breaking her nose with a club, the wiping of the knife-blade in the grass and the hands with buds and leaves, if believed, was evidence from which the jury could infer that the killing was deliberate and purposeful, and not a *Page 829 
sudden access of rage and such permeditation, [premeditation] if only for a moment, is sufficient to make it murder in the first degree. Certainly the judge could not tell the jury, without invading their province, that there was no evidence of murder in the first degree. It is stated that the charge defined the difference between murder in the first degree and in the second degree, and that there was no exception to it in any respect except in leaving the jury to pass upon the evidence as to murder in the first degree.
Formerly the defendant in a criminal proceeding was not allowed to go upon the stand in his own defense. But under our act of 1881, now Code, 1634, "The person charged shall at his own request, but not otherwise, be a competent witness, and his failure to make such request shall not create any presumption against him." This latter clause is omitted from the statute in England and in most of our States, in which failure of defendant to testify in a criminal action raises a presumption against him as in a civil action.
If the prisoner could have given testimony to acquit himself of this charge or to reduce it to a lesser degree of homicide, it is unfortunate that he did not go upon the stand to give the jury the benefit of his testimony. His failure to do so did not create any presumption against him and the judge must have so charged the jury, for it is stated that the charge was unexceptionable in every other respect than in permitting the jury to consider the evidence in the light of murder in the first degree. The fact that he did not testify was a circumstance, like the bearing of a witness on the stand, or other conduct in the trial, which though not a matter of evidence (for it was a matter in the observation of the jury) may have had some weight with the jury as to the nature of the transaction of which there was no eye-witness, unless the prisoner was such. Whether he was or not he alone could testify.
The existence of premeditation and deliberation is for the jury, not for the court, if there is any evidence, and it may be inferred from the manner of the killing and the use of the weapon whether the slaying was deliberately done or in a transport of passion. S. v. Daniel, 139 N.C. 549.
Whether certain evidence shows premeditation and deliberation is a fact to be found by the jury, and not a conclusion of law to be drawn by the court. S. v. Daniels, 134 N.C. 676, citing S. v. (784)Freeman, 122 N.C. 1012.
The conviction of the prisoner of the homicide is largely due to his being near the spot at the time, the identification of his tracks, the outcry of the woman and the prisoner's flight. When the jury found *Page 830 
the prisoner to be the slayer, the manner in which he used the knife and club and the absence of previous acquaintanceship and the cries of the woman were competent for the jury to consider on the question whether there was a deliberate intent to kill.
No error.
Cited: S. v. Baity, 180 N.C. 725; S. v. Tucker, 190 N.C. 709; S. v.Allen, 197 N.C. 686; S. v. McLeod, 198 N.C. 652; S. v. Spivey,198 N.C. 658; S. v. Beal, 199 N.C. 293; S. v. Coffey, 210 N.C. 563; S. v.Taylor, 212 N.C. 523; S. v. Dee, 214 N.C. 511; S. v. Jordan, 216 N.C. 365,366; S. v. Kelly, 216 N.C. 645; S. v. Farrell, 223 N.C. 806; S. v. Stanley,227 N.C. 655; S. v. Church, 231 N.C. 43; S. v. Bovender, 233 N.C. 689.