STATE OF NORTH CAROLINA v. ALBERT COOPER

No. 89

(Filed 14 April 1975)

1. Criminal Law § 29— mental capacity to stand trial

The test of a defendant's mental capacity to stand trial is whether he has, at the time of trial, the mental capacity to comprehend his position, to understand the nature and object of the proceedings against him, to conduct his defense in a rational manner, and to cooperate with his counsel to the end that any available defense may be interposed.

2. Criminal Law § 29— mental capacity to stand trial — determination prior to trial

When the question of defendant's mental capacity ·to stand trial is properly raised before the defendant pleads to the indictment, it should be determined prior to the commencement of the trial.

3. Criminal Law § 29— mental capacity to stand trial — determination by court or jury

The mental capacity of defendant to stand trial may be determined by the trial court with or without the aid of a jury.

4. Criminal Law § 29— mental capacity to stand trial — determination by court — appellate review

When the court conducts without a jury the inquiry into a defendant's mental capacity to stand trial, the court's findings of fact, if supported by evidence, are conclusive on appeal.

5. Criminal Law § 29— mental capacity to stand trial — effect of previous determination

The fact that, at an earlier date, a judge had found the defendant was, at that time, lacking in capacity to stand trial does not prevent the same or a different judge from conducting another hearing and reaching a different conclusion at a later date.

6. Criminal Law § 29— mental capacity to stand trial — medication during trial

The trial court did not err in finding that defendant was competent to plead to the murder charges against him and to stand trial, notwithstanding defendant had to be given medication periodically during the trial in order to prevent exacerbation of his mental illness by the tensions of the courtroom, where the undisputed medical testimony was that the medication did not have the effect of dulling his mind and that the specified dosage was adequate to keep his mental illness in remission, and an expert in psychiatry testified that, in his opinion, the defendant had the capacity to comprehend his position, to understand the nature and object of the proceedings against him, to cooperate with his counsel in his defense, and to remember what happened on the night of the alleged offenses and to discuss those events intelligently with his counsel, if he would.

7. **Criminal Law § 75— confession to hospital attendants — voluntariness — understanding**

The confessions of defendant to hospital attendants must have been made voluntarily and understandingly in order to be admissible in evidence against him.

8. **Criminal Law § 75— confessions — understanding — mental capacity**

For a confession to have been made understandingly, the defendant, at the time of making it, must have had the requisite mental capacity.

9. **Criminal Law § 75— confession to hospital attendants — mental capacity**

In a prosecution for the murder of defendant's wife and children, the trial court did not err in the admission of defendant's confessions to hospital emergency room personnel where the court found that, at the time defendant made the statements, he had a sufficient understanding to apprehend the obligation of an oath, he was capable of giving a correct account of the matters he had seen and heard with respect to the deaths of his wife and children, and he made the statements freely, voluntarily and understandingly, the attending physician, the nurse and the hospital attendant who heard the statements gave opinion testimony that defendant, when making them, was in his right mind, could comprehend what he was saying, responded normally to questions, knew and understood the meaning of what he was saying and was capable of relating recent facts stored in his memory, a psychiatrist treating defendant testified that, in his opinion, defendant was in contact with reality when he made the statements, and all the evidence was that the statements were made spontaneously by the defendant to persons who knew nothing of and were not interrogating him about the subject matter of his statements prior to his making them; evidence that defendant, at frequent intervals while in the emergency room, was nervous and shaking and from time to time stared off into space did not show a lack of memory and understanding so as to make his confessions inadmissible as a matter of law.

10. **Criminal Law §§ 5, 63; Homicide §§ 7, 18— brutality in slaying — intent to kill — insanity**

Brutality in a slaying is evidence of intent to kill, not, *per se*, a basis for finding the defendant insane.

11. **Criminal Law § 5— insanity as defense to crime**

The test of insanity as a defense to a criminal charge is the capacity to distinguish between right and wrong at the time of and in respect to the matter under investigation.

12. **Criminal Law § 5; Homicide § 7— insanity as defense to murder — jury question**

In this prosecution for the murder of defendant's wife and children, defendant's motion for directed verdict on the ground of insanity was properly overruled, the issue of insanity being for the jury, where a nurse who observed defendant in a hospital emergency room some

State v. Cooper

24 hours after the crimes testified that he seemed to be in his right mind, a hospital attendant gave opinion testimony that defendant knew right from wrong at that time, the attending physician at the emergency room gave opinion testimony that defendant then knew right from wrong, although he was suffering from paranoid schizophrenia and that, assuming the killings occurred while defendant was under a delusion that his children were from outer space, defendant nevertheless knew right from wrong and was able to control his behavior and adhere to the right and acted according to his free will in killing his wife and children, and an expert psychiatrist testified that defendant did have the capacity to distinguish between right and wrong at the time of and in respect to the matter under investigation.

13. **Criminal Law § 5; Homicide §§ 7, 28— defense of insanity — first issue for jury**

Where there is evidence justifying the submission to the jury of the question of insanity as a defense to a murder charge, the better procedure would be to submit the issue of insanity as the first issue for the jury's consideration since an affirmative answer to that issue would end the case; however, it was not error for the court to instruct the jury to consider the issue of whether defendant was not guilty by reason of insanity if it found that defendant committed either first degree murder or second degree murder.

14. **Criminal Law §§ 5, 113; Homicide §§ 7, 28— recapitulation of evidence — testimony as to irresistible impulse**

The trial court in a homicide case did not err in failing to include in its recapitulation of the evidence a doctor's statement that defendant knew right from wrong but "at the time of the alleged offense was not able to apply his knowledge of right and wrong and the alleged offense was a product of his mental illness" since this was opinion testimony that defendant acted under an irresistible impulse and irresistible impulse is not a defense under the law of this State.

15. **Homicide § 7— mental capacity — premeditation and deliberation**

A defendant who does not have the mental capacity to form an intent to kill, or to premeditate and deliberate upon the killing, cannot be lawfully convicted of murder in the first degree, whether such mental deficiency be due to a disease of the mind, intoxication, or some other cause.

16. **Criminal Law §§ 5, 63; Homicide §§ 7, 28— evidence of mental disease — effect on premeditation and deliberation — failure to instruct**

Failure of the trial court in a first degree murder case to instruct the jury that it should consider evidence of defendant's mental disease on the question of premeditation and deliberation did not constitute reversible error where the jury, by its verdict of guilty of first degree murder, established that defendant had the mental capacity to know right from wrong with reference to the acts in question, since the mental capacity to determine the moral quality of the acts included the lesser capacity to form a purpose to do such acts.

Justices COPELAND and EXUM did not participate in the hearing or decision of this case.

Chief Justice SHARP dissenting.

APPEAL by defendant from *Webb, S. J.,* at the 30 October 1972 Session of WAYNE. This case was docketed and argued as No. 3 at the Fall Term 1973.

By separate indictments, each proper in form, the defendant was charged with the murder of his wife, Catherine Cooper, and four of their five children, whose ages ranged from six years to seven months. The five cases were consolidated for trial. The jury found the defendant guilty of murder in the first degree in each case. In each case a sentence to imprisonment for life was imposed, the first three to run concurrently, the fourth to commence to run at the expiration of the sentences imposed in the first three and the fifth to run concurrently with the fourth.

Prior to the commencement of the trial, the defendant, through counsel, requested that, prior to a plea, the court determine whether he was capable of pleading to the indictment and cooperating with his counsel conducting his defense. A hearing was had upon this question in the absence of members of the jury panel.

At the hearing it was shown that at the April 1972 Session of the Superior Court, Judge Cowper, the then Presiding Judge, ordered the defendant returned to Cherry Hospital on the ground that he was suffering from mental illness to such an extent that he could not stand trial and could not assist counsel in the preparation of a satisfactory defense. Subsequently, on 12 September 1972, the defendant was returned by the hospital to the court for trial. The discharge summary, signed by Dr. Maynard, Director of Forensic Psychiatry at Cherry Hospital, stated that the defendant had paranoid schizophrenia but "medication has alleviated some of the more obvious manifestations of the disease."

The defendant then contended that a "drugged man" should not be put on trial. Dr. Maynard testified that the defendant was then suffering from paranoid schizophrenia but the disease had been "put in remission by means of drugs," that continued administration of the drug three times daily was necessary to keep the defendant's mental disease in a state of remission, there

State v. Cooper

being "no heal to schizophrenia." He further testified that, in his opinion, although the defendant had told him he did not remember any of his activities, the defendant, at the time of the pretrial hearing, was competent to stand trial, having the capacity to comprehend his position, understanding the nature and object of the proceedings against him and being able to cooperate with his counsel to the end that any available defense might be interposed. He further testified that, in his opinion, "on the date of the alleged offenses he did understand the nature and quality and wrongness of his actions," and did have "such recall of these offenses that he can intelligently discuss them with his counsel at this time." It was his opinion that the defendant "can recall what happened that night but he is going to tell his attorney he cannot."

In the opinion of Dr. Maynard, "If the defendant * * * went home as the result of this trial he would be a danger to himself and others if he did not take this medicine three times a day," but the defendant's mind was not dulled by the drug so administered, and he should continue to receive the drug three times a day during the course of the trial. (This was done, in the absence of the jury, throughout the trial.)

Dr. Ladislaw Peter, Superintendent of Cherry Hospital, testified at this pretrial hearing to the effect that, in his opinion, the defendant was suffering from paranoid schizophrenia, presently in partial remission due to treatment with psychiatric drugs in adequate doses. His evaluation of the disease was that, at the time of the alleged offense, the defendant "was not able to exercise his capacity to distinguish beween right and wrong;" that his delusional thinking centered around the idea that his wife had been or was unfaithful to him; that "assuming that as a result of his mental disorders he has formed in his mind a delusion as to what occurred and that's all he recalls about it, and if that delusion is based upon irrational thinking or irrational mental processes and that's all he has to communicate to his counsel," the defendant could not rationally participate in his defense of these charges. (Emphasis added.) Dr. Peter further testified that when the defendant, while his patient at Cherry Hospital, told him a story of intruders into his home tying up his family and killing them and attempting to kill the defendant, this was not a delusion but was an indication that "Now that he is aware of what he has done, his mind is working, he's in a desperate situation so to say and his mind worked out a defense for himself."

At the conclusion of the pretrial hearing the court found:

"The defendant is competent to understand the charges against him, the nature of the charges against him; that he is able to plead to the charges. He is competent to confer with his counsel, and the court, therefore, concludes as a matter of law that he is competent to stand trial."

The defendant thereupon entered pleas of not guilty to the several indictments and the trial proceeded. The evidence for the State was to the following effect:

On 1 December 1971, the defendant, his wife and the four small children were living in an apartment on Lincoln Drive in the City of Goldsboro, a fifth child, Boney, also less than six years of age, being temporarily with the defendant's mother in Kansas City. The defendant had previously expressed doubt that the children, other than Boney, were his. (The record discloses no basis for such doubt.)

On 1 December 1971, about 11 a.m. and again about 5 p.m., neighbors observed the defendant beating his wife and dragging her back into their apartment when she tried to flee. Following the morning episode, a neighbor heard Catherine in the house screaming and the sound of furniture being knocked over. At 7 p.m. another neighbor went to the door of the Cooper apartment and called the defendant, who did not open the door but said he could not see the neighbor then. All was then quiet in the apartment. Catherine and the four children were not seen alive by the neighbors after 5 p.m. All through the night the radio in the Cooper apartment played loudly.

At approximately 5 p.m. on 2 December 1971, the defendant, nervous, trembling and wet with perspiration, left the apartment, went to a neighbor's apartment and called a taxi, telling the neighbor, "Cat is sick." He left in the taxi and never returned. Thereafter, the neighbor knocked at the Cooper apartment door, which was locked, receiving no answer. The radio was still playing.

About 8 p.m. on 2 December, Sergeant Whaley of the Goldsboro Police Department, knowing nothing of any events at the Cooper apartment, observed the defendant in the locker room of a bowling alley, apparently quite nervous. He was wearing a house slipper on one foot and a laced shoe or boot on the other. He told the officer there was nothing wrong and that he

wanted to go home. The officer replied that he thought the defendant needed to see a doctor but offered to take him home. He patted the defendant down with his consent. He found no weapon but found strapped to the defendant's abdomen, under his clothing, a package, which the officer suspected to be three sticks of dynamite but which was later found to be three legs from a small table in the Cooper apartment. The defendant then appeared to Sergeant Whaley "to be in his right mind," but, at times, he would stop talking and would "just look out like he was staring in space."

Sergeant Whaley carried the defendant to the Wayne County Memorial Hospital for medical observation. The defendant was not then placed under arrest. He was taken to the emergency room and delivered into the care of a nurse. He was "nervous and shaky." The officer suspected that he might be "on drugs," but laboratory tests of body fluids, taken at the hospital, revealed no indication of drug use. He walked into the hospital examination room without assistance and was cooperative in being disrobed and examined. Except in the intermittent periods when he was shaking and staring off into space, he appeared to the officer to be in his right mind. He said, "Something has happened at the house," but did not say what had occurred there.

After the defendant had been taken to the hospital, another officer, Lieutenant Harvell, went to the Cooper apartment, arriving there about 8:30 p.m. Another officer and Catherine Cooper's mother were there. The apartment was locked but, by putting a small child through a window to open the door, they entered the apartment and found Catherine Cooper and the four small children dead. Each was bound with an electric appliance cord. The furniture and contents of the apartment were greatly disarrayed. The television screen, light switches and floor sockets were covered with masking tape. The bodies were in different places, partially or completely covered with bed clothing and other articles. One child's body was substantially stuffed into a pillow case.

Catherine died from a knife slash of her throat. Each child died from a severe skull fracture, inflicted in some instances with a baseball bat, in others with a hammer. Legs had been removed from a number of chairs and other articles of furniture and were scattered about the apartment. In the opinion of the County Medical Examiner, Catherine and the four children died

between 5:30 p.m. and 7:00 p.m. on 1 December 1971, shortly after the observed injuries were inflicted, and the bodies were tied up before death.

Meanwhile, the defendant was being examined and interviewed in the hospital emergency room by Nurses Bass and Johnson, Dr. Parmelee and Medical Attendant Williams in an effort to determine the nature of his difficulty. They knew nothing of what had occurred at the defendant's apartment. Before permitting Nurse Bass to testify as to statements made to her by the defendant, the court, in the absence of the jury, conduced a lengthy voir dire, at the conclusion of which the court found the defendant had not been placed under arrest at the time he made the statements in question; he had a sufficient understanding to apprehend the obligation of an oath, was capable of giving a correct account of the matters which he had seen or heard with respect to the deaths of his wife and children in the past 36 hours and made the statements in question, freely, voluntarily and understandingly. (The defendant was, of course, not under oath when making the statements to the hospital attendants.)

Thereupon, the court concluded that the statements to Nurse Bass and Williams were admissible in evidence and that the ends of justice required that they testify as to statements made by the defendant to them. The court further concluded that the ends of justice did not require that Dr. Parmelee testify to statements made by the defendant to him, or concerning specimens of body fluids taken from the defendant in the course of his examination of the defendant, these being privileged communications. However, in view of the ruling of the court concerning the statements made to Nurse Bass and Attendant Williams, the defendant withdrew his objections to evidence of the statements made by him to Dr. Parmelee and to evidence of the results of the examination of such specimens of body fluids.

Following the findings of the court at the conclusion of the voir dire, the jury returned to the courtroom and Nurse Bass testified before the jury that her conversation with the defendant in the emergency room of Wayne Memorial Hospital was initiated by him. No police officer was in the room and no officer had requested her to ask the defendant any question. The defendant asked her to call the police, saying, "Something awful is wrong at my house." She asked what he meant and he replied, "I have destroyed my wife and children." She asked,

State v. Cooper

"How did you destroy them?" He replied, "I beat them." He told Nurse Bass: "I was walking around like a normal man listening to the radio. Then I started dancing around like a wild man. I destroyed my family. The music gave me sensations which told me my family was people from the moon to kill me. I don't know why I did it. I don't understand. I destroyed my family. Somebody help me. I don't understand it." In the opinion of Nurse Bass, the defendant was in his right mind at the time he made all these statements to her. When he first entered the emergency room, he was shaking and looking from place to place and person to person. After about 15 minutes he began to talk without being led and was not shaking or staring out into space when he made the above statements.

Nurse Johnson testified that she also saw the defendant at the hospital on the night of 2 December. Nurse Johnson was of the opinion that the defendant then knew what he was doing and was able to know the difference between right and wrong. He was shaking but answered questions, knew where he was and knew that Johnson was a nurse.

Attendant Williams testified that when he was in the room with the defendant, he, being also a Vietnam veteran, talked to the defendant about the defendant's service in Vietnam. The defendant said that he needed help and in reply to Williams' inquiry as to why he needed help, the defendant said, "To try and make up for what I've done; maybe to make things right again." He told Williams he had destroyed his family, had killed his wife and child because of "sensations from the music going to his brain." The defendant also told Williams, "They [sic] wanted him to dress like an Indian and fight the Americans." Williams did not know the defendant's wife and children had been killed until the defendant so told him. While in the hospital, the defendant did not cause any disturbance or create any problems but cooperated with the hospital staff. In the opinion of Williams, the defendant knew right from wrong at the time they were talking.

Dr. Parmelee, the doctor on duty in the emergency room, testified that he examined and talked with the defendant and took samples of his body fluids. The defendant, at first, was nervous and upset about something to the point that it was difficult to establish communication, but after about 30 minutes he began to express himself and was doing so freely and of his own volition by the end of an hour. In the opinion of Dr. Parmelee,

he knew right from wrong. In the opinion of Dr. Parmelee, the defendant was suffering from paranoid schizophrenia and a paranoid schizophrenic is "not in his right mind when experiencing delusions." The first information Dr. Parmelee had as to people being dead at the defendant's home came to him from the defendant, who told the doctor that people from outer space were trying to kill him, that his children were from outer space and that he had killed his wife and children by means of a chain, knife, and strangulation. He then asked the doctor if he had done the right thing by killing his children.

In the opinion of Dr. Parmelee, assuming the killings occurred while the defendant was under a delusion that his children were from outer space, he nevertheless knew the difference between right and wrong and was able to control his behavior and adhere to the right. In the opinion of Dr. Parmelee, the method of the killings indicated preparation and not an attempt to escape from someone the defendant thought was attacking him and, though the defendant "heard voices" telling him he should kill his family, he was capable of feeling that these were wrong and he acted according to his own free will in killing his wife and children.

Captain Flores of the Goldsboro Police Department testified that he entered the room while the defendant was being treated and talked to by the hospital staff on the evening of 2 December and heard some of the foregoing statements. The defendant was not advised of the presence of Captain Flores or of the fact that he was a police officer. At that time no warrant had been issued.

Pursuant to the order of District Judge Nowell and upon the recommendation of Dr. Parmelee, the defendant was transferred to Cherry Hospital for psychiatric observation and care.

Dr. Eugene Maynard, Director of Forensic Psychiatry at Cherry Hospital, testified for the State, both on the above mentioned voir dire and before the jury. Dr. Ladislaw Peter, Superintendent of Cherry Hospital, testified on the voir dire but was not called as a witness before the jury either by the State or by the defendant. The testimony of Dr. Maynard before the jury was to the following effect:

It is possible for a paranoid schizophrenic to know the nature and quality of his act and to be able to distinguish right from wrong with reference thereto. A person who completely

believes imaginary voices are giving him directions to kill, like the person who receives such directions in reality, can choose an alternative. In Dr. Maynard's experience most paranoid schizophrenics select the correct alternative. In his opinion, "This defendant did have the capacity to distinguish between right and wrong at the time of and in respect to the matter under investigation." This opinion is based upon Dr. Maynard's study of the defendant's record, including the report of Dr. Parmelee concerning his examination of the defendant at Wayne Memorial Hospital on 2 December 1971 and the defendant's statements set forth in that report. In the opinion of Dr. Maynard, it would be entirely possible and probable that, due to the stress of what the defendant had done, he suffered "an acute schizophrenic episode" after he killed his wife and children. In the opinion of Dr. Maynard, these killings were planned and a person making such plans could distinguish between right and wrong at that time. Unreasonable fear and unreasonable suspicion are characteristics of schizophrenia. In many instances such unreasonable suspicion concerns the matter of fidelity of the spouse of the schizophrenic. In the opinion of Dr. Maynard, the defendant did not have to experience an "acute exacerbation" of his mental disease in order to commit the alleged crimes.

In Dr. Maynard's opinion, it is likely that, unless the defendant continues to receive the medication which he now receives (and received during the progress of the trial each day), an exacerbation of his disease will express itself in acts of violence to himself or to others, and "because of the mental disease from which this defendant is suffering he should not be free in society." An active schizophrenic process can well result in the commission of acts of violence over which the person who is mentally ill has no control.

Dr. Maynard's opinion as to the danger of the defendant to himself and society is based upon the doctor's being satisfied that the defendant committed the crimes for which he is under indictment. (The record discloses no objection to or motion to strike this testimony which was given under cross-examination by the defendant.) In Dr. Maynard's opinion, if the defendant, in fact, committed the offenses for which he was on trial, he did so "while in a state of active paranoid schizophrenia at which time he was dangerous to himself and to society." It is not his opinion that the defendant was then "having an acute exacerbation."

State v. Cooper

In reaching his opinion concerning the defendant, Dr. Maynard had access to and considered a discharge summary prepared by Dr. Peter, Dr. Maynard's superior at Cherry Hospital, when the defendant was sent back from that hospital to the court for trial on 2 March 1972. In that report, Dr. Peter stated that, in his opinion, "the defendant knows right from wrong but, at the time of the alleged offenses, was not able to apply his knowledge of right and wrong and the alleged offense was the product of his mental illness." Dr. Maynard does not agree with that opinion insofar as it relates to the defendant's ability to apply his knowledge of right and wrong and to the killings being products of the defendant's mental illness.

Dr. Maynard also had available and took into consideration an order signed by Superior Court Judge Cowper, on 12 April 1972, in which Judge Cowper concluded that the defendant was then suffering from mental illness to such an extent that he could not understand or assist counsel in the preparation of his defense and, therefore, ordered him re-committed to Cherry Hospital indefinitely for further treatment. Dr. Maynard, nevertheless, believes the defendant was then competent to stand trial. He also had available and took into account a report by Dr. Kim of the Veterans Hospital in Kansas City, where the defendant had been a patient until he left without permission, approximately two months before the offenses for which he was indicted. The report of Dr. Kim reflected a diagnosis of the defendant as a paranoid schizophrenic "able to cope with his affairs." The drug dosages administered by Dr. Maynard to the defendant at Cherry Hospital, and during the course of the trial, were not massive but were sufficient, when administered daily, to keep the defendant's illness in a state of "remission" despite the tensions of the trial.

The defendant offered no expert psychiatric witness. He did not testify himself but called as witnesses in his behalf his mother and Chief Renfrow, Captain Flores, and Major Gilstrap of the Goldsboro Police Department. Chief Renfrow and Captain Flores merely corroborated certain parts of his mother's testimony, and Major Gilstrap testified only that, on the night of 2 December, he concluded the condition of the defendant was such that a warrant should not then be served.

The defendant's mother testified to the effect that he had two tours of duty in Vietnam, being wounded on the second. The

State v. Cooper

defendant visited her at her home in Kansas City in August or September 1971, bringing with him his son, Boney, whom he left with his mother when the defendant, himself, returned to North Carolina some two months prior to the offenses for which he was indicted. Upon the defendant's arrival at his mother's home, he appeared very frightened and disturbed, telling her that someone was after him to kill him and the baby and insisting that she keep the house locked and dark. On several occasions he had her take him to the nearby Army Air Base in an effort to get transportation for him to Thailand, which he was never able to do. His stated purpose in going to Thailand was to keep "those people" from killing him. She did not think there were any people after him and she took him to the Veterans Hospital in Kansas City. On arrival there he thought some of the people in the waiting room were among the "people from outer space" and did not want to stay, so she took him back to her home.

Thereafter, he suggested that he go to the hospital and she took him back. He was admitted as a patient of Dr. Kim. In about 10 days he left the hospital without the doctor's permission and the following day flew to Washington hoping to be admitted to Walter Reed Hospital. He was not admitted to Walter Reed, or soon left, and returned to Goldsboro. After he left Kansas City, his mother telephoned Chief Renfrow in Goldsboro. She told him the defendant was sick and had left the hospital without the doctor's permission and requested the chief to lock him up because he was mentally disturbed. Chief Renfrow replied that he could not lock the defendant up because the defendant "hadn't done anything."

In the opinion of his mother, the defendant did not know right from wrong at the time he was in her home in Kansas City and he was not then "acting in his right mind." The defendant's mother and his wife got along well and never had any problem. His mother talked to his wife by telephone several times after he left Kansas City. None of the defendant's children was lighter in complexion than the defendant or his mother. The defendant, on one occasion, did tell his mother he was not sure that his second child (one of those killed) was his, but his mother refused to listen to any such observation and told him she did not want him to make any such statement as that to her. He did not ever do so again.

On the voir dire, conducted to determine the admissibility of the defendant's statements in Wayne Memorial Hospital on 2

December, Nurse Bass testified that in just three or four minutes after Cooper was undressed and put on the stretcher for examination, he began to talk. Over a period of 30 to 45 minutes he would talk for a few minutes normally and then would just lie on the stretcher shaking and staring out into space. Then again he would start talking. His statements began with his saying, "There's trouble at my house." When Nurse Bass asked what he meant, he said, "There's bad trouble at my house; somebody send the police." When she asked what kind of trouble, he said, "Something awful has happened; I have destroyed my family." When she asked, "What do you mean," he repeated the statement, and when she asked how he had destroyed his family, he said, "I beat them." The defendant seemed to comprehend what she was telling or asking and to know where he was. He cooperated with her. When he talked, he seemed "like a man in his right mind," "to know what was going on around him," and "could comprehend what he was saying." After he would talk for a few minutes, he would lie still and tremble and stare out into space and around the room. No police officer asked her to interrogate the defendant and she knew nothing of what had happened at the Cooper apartment. All of his statements were initiated by him. In her opinion, he was "in his right mind."

The testimony of Attendant Williams, on this voir dire, was essentially the same. In the absence of Nurse Bass from the room, Williams, just to make conversation, asked the defendant how he felt and he replied, "I need help." He was asked, "Why do you need help?" He replied, "For what I had [sic] done; to make up for what I done." When asked by Williams what he had done, he did not respond but began shaking and looking over the room. After a pause of about half a minute, Williams asked, "Albert can you tell me what you did?" The defendant replied, "I have killed my family." Williams asked no further questions and the defendant said nothing further to Williams.

Dr. Parmelee testified, on this voir dire, that he saw the defendant at the hospital about 8:30 p.m. on 2 December. During the first 20 minutes the defendant appeared highly agitated and withdrawn but was not in a "manic hyperactive state." After about 20 minutes, the defendant began to answer questions to the effect, "They're after me; they'll get you" and "trouble at home." For the next hour his thought processes seemed to clear up and he began to express himself clearly without direct questioning and to communicate in a rational manner. There was no

inducement by the police to Dr. Parmelee to initiate a conversation with the defendant.

The defendant told Dr. Parmelee there were "people dead at home," that he had killed them and had hit them repeatedly. Prior to this statement the doctor did not know there were dead people at the Cooper apartment. In the opinion of Dr. Parmelee, the defendant at this time "was oriented and knew and understood the meaning of what he was saying and responded normally to questions," and was capable of relating recent facts stored in his memory." In Dr. Parmelee's opinion, the defendant, at that time, "could distinguish right from wrong because he said he 'wanted to make things right,'" and he questioned the doctor repeatedly as to how the doctor felt about what he had done and if the defendant could make these things right again.

In Dr. Parmelee's opinion, the defendant was in condition freely and voluntarily to give permission for the withdrawal of body fluids from his body. This was done before the doctor had any discussion with the police and was for the purpose of possible medical diagnosis.

Dr. Parmalee's diagnosis was "schizophrenic reaction, paranoid type with homicidal expression." At the end of the interview, the defendant was not having delusions but was reporting to the doctor various delusions that he had had. In the opinion of Dr. Parmelee, when the defendant made the statement that he killed his wife and children, he did so freely, voluntarily and knowingly and was in control of his mental faculties and knew what he was saying. In stating to the doctor that his children were "from outer space," the defendant was reporting as an historical fact the way the defendant felt at a former time. In the opinion of Dr. Parmelee, the defendant "showed he knew right from wrong" at the time of their conversation in the hospital. He showed he had "some guilt feelings about what he had done" and was trying to find out "how he could set things right."

On this voir dire, Dr. Maynard, who did not see the defendant until a substantial time after these occurrences at Wayne Memorial Hospital, testified that he had reviewed the medical record of the defendant relating to his being in Wayne Memorial Hospital on the night of 2 December 1971 and, in his opinion, the defendant did have the ability to distinguish between the nature and quality of his acts and to distinguish between right

State v. Cooper

and wrong, though he was confused, disturbed, withdrawn, frightened, and at times out of contact with reality and at times in contact with reality. In his opinion, the defendant was in contact with reality when he was "verbalizing" at the Wayne Memorial Hospital on the night of 2 December and could have made the statements, quoted by Nurse Bass, freely, voluntarily and understandingly.

Dr. Peter testified on this voir dire that, in his opinion, the defendant has a mental disease known as paranoid schizophrenia which began in 1965 when he was in military service in Vietnam. In his opinion, if the defendant, while in Wayne Memorial Hospital, stated to Dr. Parmelee that people from outer space were trying to kill him, that his children were from outer space and he had killed his children and if he then asked Dr. Parmelee if he did the right thing by killing them, these statements would be a manifestation of his inability to distinguish right from wrong.

In the opinion of Dr. Peter, the defendant, at the time of the alleged offense, knew right from wrong, but due to the exacerbation of his illness, he was, at the time of the alleged offenses, not able to apply his knowledge of right and wrong; "as regards this particular offense he was not able to distinguish between right and wrong and adhere to the right." However, it was also Dr. Peter's opinion that, on the night of 2 December 1971, the defendant did have the mental ability to recall and relate to another person to the "historical fact" that he had killed his wife and four children, though he may not have known the full implication of his words.

Captain Flores of the Goldsboro Police Department testified on this voir dire that he went into the hospital room while the defendant was being examined and was talking with Nurse Bass, Attendant Williams and Dr. Parmelee. The defendant then seemed to be in a state of general confusion. He heard the above quoted statements by the defendant to these members of the hospital staff. He then suspected the defendant of having committed a crime and was present to watch the defendant and to see what the hospital was going to do with him, but he was not there for the purpose of making an arrest and it was never suggested to the defendant that he was under arrest. Captain Flores did not initiate or request any question put to the defendant during this period. (It was stipulated that no warrant was served on the defendant until after he was transported to the

Cherry Hospital for observation pursuant to an order of District Judge Nowell.)

*Attorney General Robert Morgan and Assistant Attorney General Raymond W. Dew, Jr., for the State.*

*Herbert B. Hulse and George F. Taylor for defendant.*

LAKE, Justice.

The defendant's contentions on this appeal are that the trial court erred: (1) In requiring the defendant to plead to the indictment and to stand trial thereon; (2) in admitting into evidence, over objection, the testimony of Nurse Bass, Attendant Williams and Dr. Parmelee concerning statements made by the defendant to them at the Wayne Memorial Hospital; (3) in denying the defendant's motion for a directed verdict of not guilty; and (4) in its instructions to the jury concerning insanity as a complete defense to the charges and in its failure to instruct the jury concerning the defendant's mental condition with reference to the matters of premeditation and deliberation. In all of these, the crucial factor is the defendant's mental capacity. The test of sufficient mental capacity in each of these areas is different from the test to be applied in the other three.

If there was no error in the trial court with reference to these matters, the imposition of the several sentences to imprisonment for life was proper, these offenses having been committed prior to our decision in *State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19. The defendant concedes in his brief that his exceptions and assignments of error directed to the denial of his motion in arrest of judgment, to the denial of his motion to set aside the verdict and to the entering and signing of the judgments are formal and present no additional question for review. We turn, therefore, to a consideration of mental capacity as related to his four contentions.

[1-5] The test of a defendant's mental capacity to stand trial is whether he has, at the time of trial, the mental capacity to comprehend his position, to understand the nature and object of the proceedings against him, to conduct his defense in a rational manner, and to cooperate with his counsel to the end that any available defense may be interposed. *State v. Jones,* 278 N.C. 259, 179 S.E. 2d 433; *State v. Propst,* 274 N.C. 62, 161 S.E. 2d 560; *State v. Sullivan,* 229 N.C. 251, 49 S.E. 2d 458; Strong,

State v. Cooper

N. C. Index 2d, Criminal Law, § 29; 21 AM. JUR. 2d, Criminal Law, § 65. When, as here, this question is properly raised before the defendant pleads to the indictment, it should be determined prior to the commencement of the trial, as was done in this instance. *State v. Propst, supra,* at page 69. It may be determined by the trial court with or without the aid of a jury. *State v. Propst, supra,* at page 68. When the court, as here, conducts the inquiry without a jury, the court's findings of fact, if supported by evidence, are conclusive on appeal. *State v. Squires,* 265 N.C. 388, 144 S.E. 2d 49. The fact that, at an earlier date, a judge had found the defendant was, at that time, lacking in capacity to stand trial does not prevent the same or a different judge from conducting another hearing and reaching a different conclusion at a later date. See, *State v. Midyette,* 270 N.C. 229, 154 S.E. 2d 66.

[6] In this instance, there was ample expert medical testimony to support the trial court's finding that the defendant was competent to plead to the charges against him and to stand trial. The fact that the defendant had to be given medication periodically during the trial, in order to prevent exacerbation of his mental illness by the tensions of the courtroom, does not require a finding that he was not competent to stand trial when, as here, the undisputed medical testimony is that the medication did not have the effect of dulling his mind and that the specified dosage was adequate to keep his mental illness in remission. Dr. Maynard testified that, in his opinion, the defendant, at the time the case was called for trial, had the capacity to comprehend his position, to understand the nature and object of the proceedings against him and to cooperate with his counsel to the end that any available defense might be interposed. He further testified that, in his opinion, the defendant, at the time the case was called for trial, had the capacity to remember what happened on the night of the alleged offenses and could intelligently discuss those events with his counsel, if he would. Under these circumstances, there was no error in requiring the defendant to plead to the indictments and to stand trial on the charges against him.

[7] The statements by the defendant to Nurse Bass, Dr. Parmelee and Attendant Williams in the emergency room of the Wayne Memorial Hospital were confessions that he had killed his wife and the four small children. "A confession is an acknowledgment in express words by the accused in a criminal case of the truth of the guilty fact charged or of some essential

part of it." Wigmore on Evidence, 3d Ed, § 821; *State v. Hamer,* 240. N.C. 85, 81 S.E. 2d 193. At the time these confessions of the defendant were made, he was not in custody and was not under police interrogation. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694, is inapplicable. Nevertheless, to be admissible in evidence against him, the confessions of the defendant to the hospital attendants must have been made voluntarily and understandingly. *State v. Gray,* 268 N.C. 69, 150 S.E. 2d 1; *State v. Whittemore,* 255 N.C. 583, 122 S.E. 2d 396; *State v. Hamer, supra.*

[8]   For a confession to have been made understandingly, the defendant, at the time of making it, must have had the requisite mental capacity. In *State v. Whittemore, supra,* at page 587, Justice Rodman, speaking for the Court, said: "If the accused has sufficient mental capacity to testify, he has sufficient mental capacity to confess." The test of the mental competency of a witness to testify is his capacity to understand and to relate, under the obligation of an oath, a fact which will assist the jury in determining the truth with respect to the ultimate facts at issue. Strong, N. C. Index 2d, Witnesses, § 1. The trial court's finding that a confession was voluntarily and understandingly made is conclusive on appeal if there is evidence in the record to support it. *State v. Fox,* 277 N.C. 1, 24, 175 S.E. 2d 561; *State v. Gray, supra.*

[9]   In this instance, the trial judge found that, at the time the defendant made the statements in question, he had a sufficient understanding to apprehend the obligation of an oath, he was capable of giving a correct account of the matters which he had seen or heard with respect to the deaths of his wife and children and he made the statements in question freely, voluntarily and understandingly.

There was evidence that while the defendant was in the emergency examining room at Wayne Memorial Hospital he was, at frequent intervals, nervous and shaking and, from time to time, stared off into space. One who had, but a few hours previously, brutally killed his wife and four tiny children would naturally exhibit signs of nervousness and emotional stress. These manifestations by the defendant in the emergency room of the hospital fall far short of a conclusive demonstration of his lack of memory and understanding sufficient to make his confession inadmissible as a matter of law.

State v. Cooper

The attending physician, the nurse and the hospital attendant who heard the statements testified that, in his or her opinion, the defendant, when making them, was in his right mind, could comprehend what he was saying, responded normally to questions, knew and understood the meaning of what he was saying and was capable of relating recent facts stored in his memory. Dr. Maynard, the psychiatric expert who had the defendant in his care before and at the trial, testified that, in his opinion, the defendant was "in contact with reality" when he made these statements. All the evidence is that the statements were made spontaneously by the defendant to persons who knew nothing of and were not interrogating him about the subject matter of his statements prior to his making them. There was no error in the admission of the testimony concerning these confessions by the defendant.

G.S. 8-53 specifically authorizes the trial judge to compel disclosure of a statement otherwise within the physician-patient privilege when necessary to the proper administration of justice. The judge so found and ordered with respect to the statements made to Nurse Bass and Attendant Williams and, thereupon, the defendant withdrew his objection as to Dr. Parmalee's testimony.

[10]  A motion for a directed verdict of not guilty has the same effect as a motion for judgment of nonsuit. *State v. Britt,* 285 N.C. 256, 204 S.E. 2d 817. On such motion the evidence for the State is taken to be true, conflicts and discrepancies therein are resolved in the State's favor and it is entitled to every reasonable inference which may be drawn from the evidence. *State v. Cutler,* 271 N.C. 379, 156 S.E. 2d 679. The basis for the defendant's motion for a directed verdict of not guilty was that, at the time the alleged offenses were committed, the defendant was insane and, therefore, not criminally responsible. Obviously, the evidence was sufficient otherwise to require the submission to the jury of the charge of murder in the first degree in each case. There was evidence that each victim was bound before he or she was killed. Four of the victims were children six years of age and under. Each death was caused by a brutal assault. Brutality in a slaying is evidence of intent to kill, not, per se, a basis for finding the defendant insane. *State v. Reams,* 277 N.C. 391, 402, 178 S.E. 2d 65; *State v. Stanley,* 227 N.C. 650, 44 S.E. 2d 196; *State v. Bynum,* 175 N.C. 777, 783, 95 S.E. 101.

[11]    Over and over again, this Court has said that the test of
insanity as a defense to a criminal charge is the capacity to
distinguish between right and wrong at the time of and in re-
spect to the matter under investigation. *State v. Humphrey,* 283
N.C. 570, 196 S.E. 2d 516; *State v. Jones, supra; State v. Ben-
ton,* 276 N.C. 641, 174 S.E. 2d 793; *State v. Rogers,* 275 N.C. 411,
168 S.E. 2d 345, cert den., 396 U.S. 1024; *State v. Atkinson,*
275 N.C. 288, 167 S.E. 2d 241, reversed on death penalty only,
403 U.S. 948; *State v. Spence,* 271 N.C. 23, 155 S.E. 2d 802,
reversed on another point, 392 U.S. 649; *State v. Creech,* 229
N.C. 662, 51 S.E. 2d 348; *State v. Swink,* 229 N.C. 123, 47 S.E.
2d 852. As Justice Branch, speaking for the Court, said in *State
v. Humphrey, supra,* "North Carolina, as well as many other
jurisdictions, has steadfastly refused to recognize the 'irresisti-
ble impulse doctrine' as a test of criminal responsibility."

In *State v. Duncan,* 244 N.C. 374, 93 S.E. 2d 421, Justice
Parker, later Chief Justice, speaking for the Court, said:

> "To determine the issue as to whether the defendant
> was insane at the time of the alleged commission of the
> offense evidence tending to show the mental condition of
> the accused both before and after the commission of the act,
> as well as at the time of the act charged, is competent, pro-
> vided the inquiry bears such relation to the person's condi-
> tion of mind at the time of the alleged crime as to be worthy
> of consideration in respect thereto. It would be impractica-
> ble to limit the evidence to such condition at the exact time."

In *State v. Atkinson, supra,* at page 313, we said that a
witness, who was an expert in the field of psychiatry, was com-
petent to relate to the jury his opinion as to the defendant's
knowledge of right and wrong at the time of the alleged offense
even though the witness did not observe the defendant on the
precise date of the alleged offense.

[12]    In the present instance, Nurse Bass, who observed the de-
fendant closely at the Wayne Memorial Hospital approximately
24 hours after his wife and children were killed, testified that,
in her opinion, he then seemed to be in his right mind. In the
opinion of Attendant Williams, the defendant knew right from
wrong at the time they were talking; i.e., approximately 24
hours after the alleged offenses. In the opinion of Dr. Parme-
lee, who attended him in the emergency room, the defendant
then knew right from wrong, although he was suffering then

from paranoid schizophrenia and, assuming that the killings occurred while the defendant was under a delusion that his children were from outer space, the defendant nevertheless knew the difference between right and wrong and was able to control his behavior and adhere to the right and he acted according to his own free will in killing his wife and children. Dr. Maynard, an expert psychiatrist, testified that the defendant did have the capacity to distinguish between right and wrong at the time of and in respect to the matter under investigation. In view of this evidence, it is clear that the question of the defendant's insanity, as a defense to the charges of murder, was for the jury under proper instructions by the court and the motion for a directed verdict of not guilty was properly overruled.

[13]    The court's charge to the jury contained the following:

"Now, in this case as to each of the bills of indictment you will be required to enter one of four verdicts. You can find the defendant guilty of first degree murder; you can find the defendant guilty of second degree murder; you can find the defendant not guilty by reason of insanity and you can find the, or you can find the defendant not guilty. That is you will have to consider five different bills of indictment, five different charges and enter one of those four verdicts as to each charge.

[Here follow correct instructions as to the elements of first degree murder and second degree murder and the burden of proof with reference thereto.]

"Now, the defendant has the burden of proving that he was insane. However, unlike the State which must prove the defendant's guilt beyond a reasonable doubt, the defendant must only prove his insanity to your satisfaction. Therefore, I charge that if you're satisfied from the evidence that the defendant at the time of the alleged crime, and as a result of a mental disease or defect, although intelligent, either did not know the nature and quality of his act or did not know that it was wrong, you must find him not guilty.

*    *    *

"Now, if on December 1, 1971, you should find and find beyond a reasonable doubt that the defendant did commit the acts which I've described for you: first degree

murder or as to second degree murder, if you are satisfied
that on that date the defendant by reason of his mental
disease or defect did not know the nature or quality of his
act or did not know the difference between right and wrong
at the time and in relation to the matters under investiga-
tion, then you would find the defendant not guilty by reason
of·insanity."

In these instructions we perceive no error. Where, as here,
there is evidence justifying the submission to the jury of the
question of insanity as a defense to the charge, we believe a
better procedure would be to submit to the jury as the first
issue for their consideration, "Was the defendant (at the time
of the alleged offense), by reason of a defect of reason or disease
of the mind, incapable of knowing the nature and quality of the
act which he is charged with having committed, or if he did
know this, was he, by reason of such defect or disease, incapable
of distinguishing between right and wrong in relation to such
act?" An affirmative answer to that issue would end the case.
If the jury answers that issue in the negative, it should then
proceed to determine the defendant's guilt or innocence of the
offense charged just as if the defendant were a person of normal
mental capacity. The failure to submit such an issue to the jury
specifically, or to give it the priority here suggested, is not, how-
ever, ground for a new trial.

The defendant's final contention is that the court failed to
charge the jury on all substantial features of the case arising
on the evidence and failed to apply the law to the evidence.

[14]    There was no error in the failure of the court to include
in its recapitulation of the evidence the statement by Dr. Peter,
contained in the discharge summary by which the defendant was
returned by Cherry Hospital to the Superior Court for trial on
2 March 1972. Dr. Peter did not testify before the jury but
Dr. Maynard, who did testify, said, on cross-examination by the
defendant, that he, in arriving at his own expert opinion as to
the ability of the defendant to distinguish right from wrong
at the time of the alleged offenses, had available, and took into
consideration, Dr. Peter's opinion as set forth in the discharge
summary. That statement of Dr. Peter, put before the jury by
the defendant's cross-examination of Dr. Maynard, was that the
defendant knows right from wrong but "at the time of the
alleged offense *was not able to apply his knowledge* of right
and wrong and the alleged offense was the product of his mental

illness." (Emphasis added.) This was the expression of an opinion that the defendant, by reason of his mental disease, acted under an irresistible impulse, notwithstanding his ability to distinguish between right and wrong with reference to such act. Since an irresistible impulse is not a defense under the law of this State, as above noted, it was not error for the court to fail to refer to this statement by Dr. Peter in his recapitulation of the evidence.

[16] The defendant says the court also erred in its failure to instruct the jury that it should consider the evidence of the defendant's mental disease on the question of premeditation and deliberation.

[15] It is well established that to convict a defendant of murder in the first degree, when the killing was not perpetrated by one of the means specified by G.S. 14-17 and was not committed in the perpetration of or attempt to perpetrate a felony, the State must prove beyond a reasonable doubt that the killing was with premeditation and deliberation. G.S. 14-17; Strong, N. C. Index 2d, Homicide, § 4, and the numerous cases therein cited. It is also well established that a specific intent to kill is a necessary ingredient of premeditation and deliberation. *State v. Baldwin,* 276 N.C. 690, 700, 174 S.E. 2d 526; *State v. Robbins,* 275 N.C. 537, 169 S.E. 2d 858; *State v. Propst, supra,* at page 71. It follows, necessarily, that a defendant who does not have the mental capacity to form an intent to kill, or to premeditate and deliberate upon the killing, cannot be lawfully convicted of murder in the first degree, whether such mental deficiency be due to a disease of the mind, intoxication, as in *State v. Alston,* 214 N.C. 93, 197 S.E. 719, or some other cause. It does not follow, however, that there was reversible error of omission in the charge of the trial court in the present case.

[16] The jury, by its verdict, has established that the defendant, at the time of the alleged offenses, had the mental capacity to know right from wrong with reference to these acts. This distinguishes the present case from cases such as *State v. Alston, supra,* dealing with intoxication as a defense. That finding, supported as it is by ample evidence, is conclusive on appeal, irrespective of a contrary opinion by the defendant's mother and irrespective of inferences which might reasonably be drawn from the State's evidence as to the defendant's appearance and manner when first observed by the police officer and when being

State v. Cooper

examined in the emergency room of the Wayne Memorial Hospital.

We may take judicial notice of the well known fact that a dog, a wild animal or a completely savage, uncivilized man may have the mental capacity to intend to kill and patiently to stalk his prey for that purpose. The law, however, does not impose criminal responsibility upon one who has this level of mental capacity only. For criminal responsibility it requires that the accused have, at the time of the act, the higher mental ability to distinguish between right and wrong with reference to that act. It requires less mental ability to form a purpose to do an act than to determine its moral quality. The jury, by its verdict, has conclusively established that this defendant, at the time he killed his wife and the four little children, had this higher level of mental capacity. It necessarily follows that he had the lesser, included capacity. The jury also determined that he did, in fact, premeditate and deliberate upon the intended killings. It made these determinations in the light of proper instructions as to what constitutes premeditation and deliberation. Premeditation and deliberation do not require a long, sustained period of brooding. *State v. Fountain,* 282 N.C. 58, 70, 191 S.E. 2d 674; *State v. Reams, supra.*

No error.

Justices COPELAND and EXUM did not participate in the hearing or decision of this case.

Chief Justice SHARP dissenting:

I concur in the majority's conclusion that the trial court correctly ruled: (1) that on 30 October 1972 defendant was competent to stand trial upon the five indictments which respectively charged him with the first degree murder of his wife Catherine and their four children, Pamela, aged six; Albert, Jr., aged five; Dawn, aged three; and Josephine, aged seven months; (2) that the statements which defendant made to hospital personnel in the emergency room on 2 December 1971 were admissible in evidence; and (3) that defendant's motion for a directed verdict of not guilty was properly overruled. I dissent from the holding that the judge correctly charged the jury with reference to insanity and mental disease as it bears upon an accused's guilt of murder in the first degree.

State v. Cooper

Plenary undisputed evidence established that on 1 December 1971, the date of the homicides for which defendant now stands convicted, he was *and had been* suffering from the diagnosed, serious mental disease of paranoid schizophrenia, which was then in a state of exacerbation. This evidence was for the jury's consideration in determining whether defendant *had proved to the satisfaction of the jury* that he was *insane* as defined by this Court and therefore completely exempt from criminal responsibility for the homicides of which he has been convicted. The trial judge purported to charge the jury to this effect. However, he failed to charge the jury that this evidence was also for consideration in determining whether *the State had* proved beyond a reasonable doubt the elements of specific intent to kill, after premeditation and deliberation, essential to conviction for murder in the *first* degree. In my judgment, defendant is entitled to a new trial for error of both commission and omission in the judge's instructions to the jury.

My views with reference to this case are those stated by former Chief Justice Bobbitt at the Fall Term 1974 in an opinion which was not adopted by the Court. With minor variations the statement of facts and propositions of law contained in this dissent are taken from that opinion, in which I concurred when it was tendered to the Court. In the main, the variations herein are necessary to make the phraseology of a majority opinion conform to that of a dissent and to set forth the facts, insofar as possible, in chronological order.

That the statement of facts in this dissent and in the majority opinion contain duplications is regrettable. However, consideration of the question whether the court should have instructed the jury to consider evidence of defendant's mental disease on the issue of premeditation and deliberation requires detailed consideration of the evidence relating to defendant's mental disease and his abnormal behavior which was characteristic of the disease. To indicate as clearly as possible the basis of the legal opinions herein expressed, in the facts set out below, I have endeavored to narrate defendant's story chronologically as it emerged from all the evidence.

Defendant was born on 14 August 1944. In September 1965, while in military service, he married his wife Catherine, who was 15 or 16 years old and a resident of Goldsboro. At that time she was expecting a child, which, defendant told his mother, was his.

State v. Cooper

In 1965, while defendant was on active duty in Vietnam, he experienced his first acute schizophrenic reaction and fired an M-16 rifle into a headquarters tent occupied by troops. He was sent by plane to Walter Reed Hospital in Washington, D. C. On 1 June 1966 he was returned to his unit in Vietnam. In 1968 he was in Womack Hospital at Fort Bragg for six months. There he "was diagnosed schizophrenia, and received a medical discharge from the service." In 1969 he returned to Goldsboro where he worked intermittently at various jobs. Frequently he "was out sick." In 1970 he was treated as an outpatient at Seymour Johnson Air Force Base Clinic.

In 1971 defendant, his wife, and their five children were living in Lincoln Homes, a low-rent housing project in Goldsboro. In July 1971 defendant's mother-in-law heard him tell Catherine that four of the five children were not his. (As noted in the majority opinion, nothing in the evidence substantiates defendant's belief that his wife was unfaithful.)

On or about 1 September 1971 defendant arrived at the home of his mother, Mrs. Suevonia Stewart, in Kansas City. With him was his four-year-old son, Suevonia (Boney), his mother's namesake. Two weeks before he had telephoned Mrs. Stewart four times in one day to tell her that he was coming. Upon his arrival defendant was "very frightened and disturbed." He "put the baby down," closed the door and a venetian blind, and said "that someone was after him to kill him and the baby; that he just did make it." He asked her to take him to Richard Gebur Air Base, saying: "There's a plane there that is going to take me directly to Thailand." He said he was going to Thailand "to keep those people from killing me. . . . I've got to get away fast before they get here." All of this conversation occurred within an hour or so after he arrived at Mrs. Stewart's house.

Defendant was so determined that she took him in her automobile to Richard Gebur Air Base. There they learned that no planes were "fixing to leave," and defendant said: "They must be gone; they are not coming back; we'll have to go back to the house and I'll make other arrangements." He was still very frightened when they got back home. He asked her not to turn on any lights, to make sure the doors were locked, and for all the family to stay in the same room. No one went to bed that night. She slept in a chair, holding the baby in her lap. Her younger daughter sat by her. Defendant sat across from them

State v. Cooper

and said, "[d]on't make a sound because those people are all around the house." She knew he was sick and tried in every way to comfort and reassure him. She told him her dog would bark if anyone came around the house; that no one was going to bother him. She "kept talking to him this way all night and finally got him kind of calmed down."

There were other nights when he could not sleep. He would not stay in a room by himself but stayed with his mother. He was afraid "something or some people from outer space were coming." One night he reported to his mother that [they] came after [him] and they wanted to talk to [him]" but that he refused to talk to them at night. Another night when Mrs. Stewart woke up, defendant was sitting over her, staring down on her "wildly and frightened looking." At that time she had the feeling he was about to harm her. When she asked what was wrong, he replied: "You've suffered so much in raising us up; now you still have to go to work." His mother explained that she was happy; that she still had her health and strength and was self-supporting; that she thanked God for letting her raise her children, and that she hoped he would raise his in the manner she had raised him.

She took him to the airport at least three more times because he kept insisting that a plane was supposed to take him to Vietnam. He was "in such a state of mind and such a rage" that she "saw no other way but to put him in the car and carry him out there."

Defendant did not leave the home alone. Although employed, Mrs. Stewart did not go to work regularly because defendant would cry like a small child and beg her not to leave because he was afraid to stay at home. On the days she worked, she would leave Boney with a neighbor in the same apartment.

About a week after his arrival, Mrs. Stewart first took defendant to the Veterans Hospital in Kansas City, but he became frightened and would not stay. He said the people in the waiting room were some of the "people from outer space." He returned to his mother's apartment where he stayed until, at his request, he was admitted to this hospital on September 17. His medical history at that time shows he was under the delusion he was being controlled by a cat. There he was rediagnosed "schizophrenia, paranoid type."

His mother saw him frequently while he was a patient in the hospital. After he had been in the hospital about fourteen days, he called her to come for him. She did not go because a nurse also called and asked her not to come. However, upon her return from a trip to a grocery store, she found defendant at her home. He had taken "unauthorized leave" from the hospital because (he said) he wanted "to go to Walter Reed where [he could] be near Catherine and the children." The next morning, 30 September 1971, she took him to the airport where he obtained passage to Washington on a military flight. Defendant left the child Boney with his mother. He had previously told her he had brought that child with him because Boney was the only one who could help him; that Boney took care of him.

In Washington, Walter Reed Hospital refused to admit him but referred him to a VA Hospital there. However, nothing in the record suggests that he attempted to secure admission to this hospital.

When Mrs. Stewart learned by a telephone call to Walter Reed Hospital that defendant was not there, she made two calls to Goldsboro, one to Goldsboro's Chief of Police, Roy Renfro, and the other to Mary Jane Harper, the occupant of the apartment adjoining defendant's. She told Chief Renfro to watch out for defendant; that he was mentally disturbed; that he had left the hospital without the doctor's permission and to lock him up "if there was anything wrong." Renfro promised to call Catherine and let her know defendant was on his way home, but told her "he couldn't lock Albert up because Albert hadn't done anything."

Mrs. Harper testified that Mrs. Stewart told her she thought defendant was "on his way back home and if he comes there and you hear anything over there you call the police. I've already called the police there, and I'm telling you and I have wrote Catherine a letter because I told him all of those children could not be light." According to Mrs. Harper, all the children were light like defendant and his mother except the little boy, Albert, Jr., who was darker like Catherine.

Two days later when Mrs. Stewart reached defendant by telephone, he told her that because Walter Reed did not have a bed for him he "had come home"; that "he and Catherine had made everything all right and he wanted to come back to Kansas City and buy a home." Thereafter Mrs. Stewart talked with

Catherine, with whom she "had a wonderful relationship," more often than with Albert. Her last conversation with Catherine "was about a week before December 1, 1971."

Mrs. Stewart testified that none of the children had a lighter complexion than either defendant or herself; that defendant "never told [her] that none of the children were his except the one he brought out to Kansas City"; that he did say "he wasn't sure about Albert, Jr., his second child." She reprimanded him and refused to "listen to that conversation." She told him she "didn't want him being like so many other young men. They wait, they love their wife to death until they get pregnant and then they want to deny their children." Thereafter, defendant made no other statement to her "about not being the father of any of the other children."

Mrs. Stewart's testimony on direct examination concludes as follows: Based upon her observations of defendant during the entire time he was visiting her in Kansas City—before he went to the VA Hospital there, while he was in the VA Hospital, and after he left the VA Hospital—it is her opinion that he "didn't know right from wrong at that time . . . that he was not acting in his right mind . . . that he was insane."

In October 1971 and thereafter defendant went to Seymour Johnson Air Force Base Clinic at Goldsboro several times. Being on "temporary retirement," he was entitled to and did receive medications at this clinic. However, because of his continued failure to keep appointments, the clinic refused to give him any more time. In the opinion of Dr. Ladislaw Peter, the psychiatrist who is the Superintendent of Cherry Hospital, defendant's condition "was getting gradually worse and worse" after his return to Goldsboro in October 1971.

On Wednesday, 1 December 1971, between 11 and 11:30 a.m., George Uzell, a neighbor, saw Catherine run from the Cooper apartment. Defendant caught her, threw her to the ground, beat her with his fists, and pulled her back into the apartment. Shortly thereafter, Uzell heard "some screams" and noises "like somebody knocking over furniture or something." He figured it was "a family problem" and did nothing to help Mrs. Cooper. Nor did he call the police. About 5 p.m. Catherine ran from her apartment to the front door of Mrs. Harper's apartment. When Mrs. Harper went to the door defendant pulled Catherine back, threw her down on the ground, and was "mashing her in the

bosom." Catherine called out, "Miss Mary, call the police," and defendant said, "Yes, Miss Mary, call the police and call the rescue squad." Mrs. Harper requested the operator to send the police to her address, and the operator said, "all right." When she went back to the door, neither Catherine nor defendant was in sight. The police never came to Mrs. Harper's house. About 7 p.m. Mrs. Harper knocked on the door of the Cooper apartment. When she identified herself, defendant said, "Miss Mary, I can't see you now." At that time she heard no sound in the apartment. The radio in the Cooper apartment, "one of those stereos," played all during the night of December 1.

The radio was still playing on Thursday, December 2, about 5 p.m. when defendant came over to the Harper apartment, and called a cab. At that time he "was nervous and trembling and real wet with perspiration." As he turned to go, he said, "Cat is sick." When Mrs. Harper asked for details, defendant did not answer. The cab arrived, defendant went back into *his* apartment, got his coat, and left in the cab. About 7 p.m. Mrs. Harper went to the Cooper apartment. No one answered her knock and the door was locked. She then called Mrs. Jackson, Catherine's mother, to come over and check on Catherine, that defendant had said she was sick. When Mrs. Jackson and her sons arrived at the Cooper apartment, they were met by a policeman. (A description of the situation they found in the Cooper apartment is deferred.)

Nothing in the evidence discloses the whereabouts or activity of defendant on December 2 from 5 p.m. until about 8 p.m. when Sergeant Whaley of the Goldsboro police force found him in the locker room of a bowling alley after having been advised of the presence of a sick person there. Defendant appeared to be "in a nervous condition." He had "a slipper on one foot and a shoe on the other." Although defendant insisted that "nothing was wrong," Whaley thought he needed to see a doctor and asked if he could take him to the hospital. Defendant said, "No, I want to go home, that's what I want to do." Asked if he "had a knife or anything on him," defendant replied, "No," and gave Whaley permission to "pat him down." Whaley found no knife but felt something on defendant's stomach which defendant referred to as "a package." He told Whaley he could not see the "package," that he was going to deliver it on Lincoln Drive. Whaley, apprehensive that the package contained sticks of dynamite, telephoned Lieutenant Harvell to

meet him at Jefferson and Ash Streets. Defendant got into the car "of his own free will and accord" after Whaley told him he "was going to take him home." Whaley drove to the intersection and was met by Harvell, who had known defendant. At Harvell's request, defendant opened his shirt. Three table legs were taped to his stomach. Defendant ripped off the tape and the table legs were removed. Each was about an inch in diameter and about eleven or twelve inches long.

Leaving Harvell, Whaley took defendant to the Wayne County Memorial Hospital between 8 and 8:30 p.m. Upon arrival, defendant "was nervous and shaking." Every once in a while he "would just shake all over." During the time defendant was in the hospital, he was not under arrest. Whaley took him there to find out what was wrong with him. He thought defendant "might be on drugs or something like that." Whaley observed defendant during six or eight periods of shaking; Harvell, during two. According to Harvell, "Overall, taking his overall behavior, he acted like a man not in his right mind." When he was shaking and staring into space, he did not appear to be in his right mind. At other times he did. After defendant was received in the emergency room, Whaley had no further conversation or contact with defendant, but he observed him occasionally through the open door to the room in which he had been placed.

In the emergency room defendant told Mrs. Bass, the nurse in charge, that he needed help. He told her to "call the police"; that "something awful is wrong at my house"; that "he had destroyed his wife and children"; that he "beat them." When Mrs. Bass talked to defendant, "he acted relaxed at times; at times he was shaking almost over his entire body and was staring about in the room." In the treatment room, he looked "place to place and from person to person" for ten to fifteen minutes. On more than one occasion, defendant said, "I don't understand; I don't know why I did it." When questioned, he "started shaking and looking from place to place again."

Defendant also made these statements to Mrs. Bass: "I was walking around like a normal man listening to the radio. Then I started dancing around like a wild man. I destroyed my family. . . . The music gave me sensations which told me my family was people from the moon to kill me." All during the time defendant was in the emergency room (almost three hours) he "was in certain intervals shaking, and glancing from place to place."

Defendant's statements to Mrs. Bass were "in sketches sort of" over a period of 30 to 45 minutes.

About 9 p.m. when Isaiah Williams, Jr., a medical attendant, asked him how he was feeling, defendant said he did not know and "started trembling and shaking and looking all around the room." Later, defendant told him he needed help to try to make up for what he had done, "maybe to make things right again"; that he had killed his wife and children; that the reason he did it "was sensations from the music going to his brain."

During Williams's first conversation with defendant on December 2, defendant "talked only as if he was in a total state of confusion and he knew nothing that had happened." He was in a nervous state, shaking, trembling, and looking all about the room, and reeling off, "I need help; I need help; I need help." After an hour or two Williams thought defendant seemed a little calmer, but he was still trembling as from fright. In answer to Williams's questions as to why he did it, defendant said, "It was sensations going to my brain, music from the radio giving these sensations." At one point defendant said that "they wanted him to dress like an Indian and fight the Americans." After making this statement, defendant dropped back into his confused state and did not respond to Williams again.

Dr. Warren Parmelee, the physician on duty in the emergency ward, is a medical doctor who had had "some studies in psychiatry." He attended defendant for about an hour and a half on the night of December 2. He testified that at first defendant was so nervous and upset it was difficult to communicate with him, but after 20 or 30 minutes he began to make such statements as, "They're after me . . . they will get you . . . trouble at home." Later he expressed himself in more complex phrases. He said, "There is someone dead at home and the police should check." At the end of an hour he was reporting that he had killed his wife and children because they were from outer space. At one time when the hospital radio ceased to play music and began a news broadcast, defendant told Dr. Parmalee that "those voices" were telling him to kill Dr. Parmelee. He was very disturbed by those voices. It was Dr. Parmelee's opinion, and he so advised the police officers, that defendant "should not be sent to jail and confined"; that he should be put in Cherry Hospital with maximum security. Dr. Parmelee diagnosed defendant's condition as schizophrenic reaction, paranoid type, with homicidal expression.

During the late hours of 2 December 1971, Chief District Court Judge Nowell signed an order "that Albert Cooper be confined to Cherry Hospital for a period of sixty days for the purpose of undergoing psychiatric examination." After having remained in the Wayne County Memorial Hospital "some four hours," defendant was taken on a stretcher in a rescue squad truck to Cherry Hospital. Whaley and Captain Flores followed the truck in a police car. Harvell went to defendant's apartment.

When Lieutenant Harvell arrived at defendant's apartment at approximately 8:30 p.m., he found Officer Isler, Mrs. Jackson, and her sons outside. The doors were locked, and no one had entered. Harvell helped Mrs. Jackson's young son through a window, and he opened the front door. Upon entering the apartment, the group came upon a scene of death and destruction, described in part as follows:

The apartment "was in a total and complete disarray." The tables were turned over; legs were off of chairs and couches; and contents of drawers and closets were scattered around the house. Three legs missing from one of the tables were those defendant had on his person when Whaley found him in the bowling alley at 8 p.m. Bedclothes covered some of the victims. Albert, the five-year-old, had been put in a pillowcase, "head and all," and was completely covered. In the living room, music was playing very loud; the television was not turned on. The front of the television was covered with masking tape. The light sockets and light switches were also taped. The bodies of Catherine and Pamela were in the living room. Albert's body was near a closet. The body of Dawn, the three-year-old, was in the kitchen. The body of Josephine, the baby, was in the bathroom. All were dead, their hands tied behind them, principally with electric cords.

Dr. Jack Newton Drummond, Medical Examiner for Wayne County, joined the police at the Cooper apartment at 8:40 p.m. on December 2. In Dr. Drummond's opinion, Catherine bled to death from severed arteries and veins in her neck; Pamela died of a skull fracture, probably inflicted by a baseball bat; and Albert, Dawn, and Josephine died of skull fractures, probably inflicted by a hammer. It was his further opinion that all the victims had been dead "one and a half to three hours" when he examined the bodies; that all of them "were within the same state of rigor mortis."

Dr. Drummond testified that he found in the bathroom of the apartment "a bloody butcher knife on the floor, a hammer and a baseball bat bloody"; that "[t]here was a large puddle of blood on the carpet extending from under [Catherine's] neck and head," and that he observed there "were socks on [Catherine's] hands"; that he found a radio in the refrigerator and records in the washing machine. Dr. Drummond "couldn't say either way as to whether a person who would create the condition or situation as existed in the Cooper apartment on the night in question [was] a person who did not know right from wrong at the time that this took place." All he could say was that the mental condition of the person who did this was "severely disturbed."

Defendant was admitted to Cherry Hospital on the morning of 3 December 1971 in such a state of agitation that he was put under heavy sedation. He was disoriented except as to place and person, suffering severe thought disorders, and admitting to both auditory and visual hallucinations. Dr. Ladislaw Peter, who was then assistant superintendent of the hospital and regional director for forensic psychiatry and attendant for the forensic unit, examined him on December 4 and thereafter.

On 9 March 1972 Dr. Peter reported to the court that "due to treatment with psychiatric drugs in adequate doses" defendant's disease, paranoid schizophrenia, was presently in partial remission, and that he was able to stand trial.

At April 1972 Session Judge Cowper conducted a hearing to determine whether defendant had sufficient mental capacity to plead to the bill of indictment and conduct a rational defense. After hearing the testimony of Dr. Peter and statements by defendant's court-appointed counsel, Judge Cowper found as a fact that at time defendant was suffering from mental disease to such an extent that he could not stand trial or assist counsel in the preparation of his defense. Judge Cowper ordered that defendant "be recommitted [to Cherry Hospital] to remain indefinitely and to receive treatment."

In an order dated 9 August 1972, signed by Judge Fountain, provided for the return of defendant from Wayne County jail to Cherry Hospital. The record does not show the circumstances leading up to the entry of this order.

Pursuant to a report and discharge summary from Cherry Hospital, signed by Dr. Eugene V. Maynard, Director of the

Forensic Psychiatric Unit at Cherry Hospital, dated 12 September 1972, defendant was taken from Cherry Hospital to the Wayne County jail. Later he was returned to the Cherry Hospital for "substantial" medication, having regressed while in jail awaiting trial.

Pursuant to a discharge dated 5 October 1972, defendant was sent from Cherry Hospital to the Wayne County jail. However, the record shows that he was recommitted to Cherry Hospital on 9 October 1972 by order of Judge Fountain. The record does not disclose the circumstances leading up to the entry of this order.

There was no further discharge of defendant from Cherry Hospital. He was classified there "as a boarder only." During the trial at 30 October 1972 Session, defendant was transported daily between the courthouse and Cherry Hospital and received medication at the hospital given under Dr. Maynard's supervision.

At 30 October 1972 Session, before pleading, defendant's counsel again raised the question and asked for a determination of whether defendant was then capable of pleading to the indictment and of conducting a rational defense. To determine this question, Judge Webb conducted a *voir dire* hearing. The evidence consisted of the testimony of Dr. Peter, who was then the Superintendent of Cherry Hospital, and of Dr. Maynard. Reports previously submitted by each of these psychiatrists were also in evidence. Both agreed that defendant was then able to stand trial, and Judge Webb so found.

In addition to the *voir dire* to determine defendant's competency to stand trial, Judge Webb also heard evidence to determine whether defendant's statements to personnel at the Wayne County Hospital on the night of 2 December 1971 were admissible in evidence. Dr. Peter, Dr. Maynard, and Dr. Parmelee testified on this second *voir dire*. Dr. Maynard and Dr. Parmalee also testified before the jury. Dr. Peter, however, did not. The record offers no explanation why the defense failed to call him as a witness.

The doctors all agreed that defendant had been and was then suffering from paranoid schizophrenia. In brief summary their descriptions of the characteristics and symptoms of this serious mental disease are narrated below.

State v. Cooper

According to Dr. Maynard: "Paranoid schizophrenia is a mental disease of psychotic depth, that is, of insanity depth. . . . Psychosis simply that the mental functioning of an individual is so impaired as to prevent his meeting the everyday problems of life in an external environment." Paranoid schizophrenia "is characterized by disorders of thinking, behavior and emotional feeling, often manifested by hallucinations and delusional thinking." It is characterized by periods of exacerbation and of remission. Exacerbation is an acute schizophrenic episode in which there may be "a complete disorganization of a personality." Although "[t]here is no heal to schizophrenia," the disease may be kept in remission by tranquilizing drugs.

According to Dr. Peter: Schizophrenia is characterized by an estrangement of the individual from reality which is sometimes complete. Paranoid means that a person has false ideas, delusions, such as delusions of grandeur and of morbid fears of persecution. There is usually no factual basis for the suspicions of a person who is paranoid, but he cannot be shaken from his delusions by any argument or reason. A paranoid schizophrenic has symptoms of two separate mental disorders simultaneously. A worsening of the condition creates a relapse or exacerbation of the disease. Paranoid schizophrenia is in remission when under control by drugs.

According to Dr. Parmelee: Hallucination is a sensory perception; it is something a person hears, smells, feels, or sees which does not really exist. A delusion is the interpretation of a situation contrary to what is actually happening. A paranoid schizophrenic who is experiencing either delusions or hallucinations is at that time out of contact with reality and is not in his right mind.

The testimony summarized below reveals the divergent views of Dr. Peter and Dr. Maynard, the two psychiatrists, and the views of Dr. Parmelee, a medical doctor, with reference to defendant's mental condition at the time of the homicides and during the time he was in the Wayne County Hospital on December 2.

Dr. Peter, who first saw defendant three days after the homicides, testified that he had "examined him, his background, his medical records, and everything pertinent to his psychiatric evaluation"; that in his opinion "at the time of the alleged offense he [defendant] was not able to exercise his capacity to

distinguish between right and wrong"; that when a person suffering from paranoid schizophrenia is experiencing either auditory or visual hallucinations he is in a state of relapse, and is less able to distinguish between right and wrong and to understand the nature and consequences of his actions. "It is possible that he knows the nature and character of his act but is not able to distinguish between right and wrong with reference to it. Based on the testimony of the Wayne County Hospital personnel who saw defendant on the night of December 2, Dr. Peter formed the opinion "that at that time he [defendant] was out of contact with reality."

On *voir dire* Dr. Peter said: "I am familiar with the M'Naghten rules under the legal concept of insanity. In my opinion on the date that this offense was committed the defendant, because of his mental disease, was unable to decide at that point, apply the rule of right and wrong in this particular case. In my opinion as regards this particular offense he was not able to distinguish between right and wrong and adhere to the right."

Dr. Maynard, basing his evaluation of defendant upon Dr. Parmelee's report, hospital records, information from members of the staff, his personal examination and observation of him since 1 June 1972, and other testimony in the case with reference to defendant's conduct before and after the killings, made the following statements upon *voir dire* and before the jury:

"I could not give an answer as to whether he was suffering from the disease [paranoid schizophrenia] on the date of the alleged offense. The disease is one of remission and exacerbation. In my opinion on the date of the alleged offenses he did understand the nature and quality and wrongness of his actions.

"I have examined Dr. Peter's report in which he stated that it was [his] opinion that due to exacerbation of his longstanding mental illness, the defendant at the time of the alleged offense was not able to apply his knowledge of right and wrong and that the alleged offense was the product of his mental illness. I do not agree with that conclusion. Dr. Peter is my superior at Cherry Hospital."

"It is a frequent thing for psychiatrists to disagree on diagnosis on the same facts and in this case there actually was a disagreement between myself who first saw the defendant in

June 1972 at which time I had been a psychiatrist for a month and the opinion of Dr. Peter who at the time was acting superintendent of Cherry Hospital and had been a psychiatrist for 32 years."

"If a person completely believes what imaginary voices are telling him [kill or be killed], he can choose the alternative of being killed." Dr. Maynard added that, in deciding upon a course of behavior, every person "is presented with alternatives whether he is hallucinating or whether he is not hallucinating"; that it has been his "experience with paranoid schizophrenics that most of them select the correct alternatives."

Dr. Maynard also testified that in his "psychiatric opinion," defendant should not go free in society; that most persons suffering with paranoid schizophrenia resist medications; that defendant's disease was in remission because of drugs, the continued use of which is essential to keep the disease in remission; that if defendant should be returned to uncontrolled living in his community where he is not properly supervised and medicated it is likely he could commit acts just as violent as those charged in this case; that, in the event of his acquittal, he should be recommitted to Cherry Hospital to protect himself and society "from a possible regression to an active schizophrenic process"; that "an active schizophrenic process can well result in the commission of acts of violence over which the person who is mentally ill has no control."

In the opinion of Dr. Parmelee a person can be out of touch with reality and simultaneously know right from wrong. He testified: "[I]t is true that as far as he [defendant] was concerned there were voices telling him that his family were from outer space and that he was going to be attacked by them . . . yet he was capable of feeling that these were wrong, and I feel that in my opinion he acted according to his own free will in committing these crimes . . . . I would say that if you and I are told to do something we know better than to do it. I am not suffering from any severe mental disorders to my knowledge. I feel that my response to a command that was completely unreasonable could be judged under the same context as Albert Cooper's response even though he was suffering from an exacerbation of his disease. I feel that he is still just as capable of refusing to commit an immoral act as a person not suffering from the disease."

State v. Cooper

The foregoing resumes make it quite clear that, despite their conflicting opinions as to whether defendant had mental capacity to understand what he was doing at the time of the homicides and, if he did, to know what he was doing was wrong, the doctors all agreed that defendant was the victim of a serious mental disease.

In this case, upon each of the five bills of indictment, the State asked for a verdict of guilty of murder in the first degree as a "willful, deliberate and premeditated killing" within the meaning of G.S. 14-17.

In his charge to the jury, after defining each of the elements of first degree murder and of second degree murder, the judge gave instuctions that the burden of proof was on the State to satisfy the jury from the evidence beyond a reasonable doubt of every element of the crime before they could find defendant guilty of such crime.

With reference to insanity as a complete defense, the court instructed that the burden of proof was on the defendant to prove to the satisfaction of the jury that he was insane when the alleged crime was committed.

In accord with the indicated prior instructions, near the conclusion of the charge, the court instructed the jury as follows:

" . . . [I]f you find from the evidence and beyond a reasonable doubt that on or about December 1, 1971, Albert Cooper intentionally and without justification or excuse used either a knife, baseball bat or hammer or any other thing as a deadly weapon thereby proximately . . . causing the victim's death, and that Albert Cooper intended to kill the victim, and that he acted with malice and premeditation and deliberation, it would be your duty to return a verdict of guilty of first degree murder; however, if you do not so find or have a reasonable doubt as to one or more of these things you will not return a verdict of guilty of first degree murder.

"Now, if you do not find the defendant guilty of first degree murder in any of the bills of indictment you must determine whether he is guilty of second degree murder . . . . If you find from the evidence and beyond a reasonable doubt that on or about December 1, 1971, Albert Cooper intentionally and with malice and without justification or excuse and using either

State v. Cooper

a knife, baseball bat or hammer or any other object as a deadly weapon and attacked the victims, thereby causing the victim's death, nothing else appearing, it would be your duty to return a verdict of second degree murder; however, if you do not so find or have a reasonable doubt as to one or more of these things you will not return a verdict of second degree murder.

"Now, if on December 1, 1971, you should find and find beyond a reasonable doubt that the defendant did commit the acts which I've described for you: first degree murder or as [sic] to second degree murder, if you are satisfied that on that date the defendant by reason of his mental disease or defect did not know the nature or quality of his act or did not know the difference between right and wrong at the time and in relation to the matters under investigation, then you would find the defendant not guilty by reason of insanity.

"On the other hand if you should not be satisfied beyond a reasonable doubt as to any of the things necessary to find the defendant guilty of either first degree murder or second degree murder, then you should find the defendant not guilty."

In order to form a specific intent to kill, after premeditation and deliberation, one must have the required mental capacity. A person who is *legally* insane is devoid of such mental capacity. The instructions place upon the State the burden of establishing beyond a reasonable doubt defendant's specific intent, after premeditation and deliberation, to kill the deceased. They place upon defendant the burden of establishing to the satisfaction of the jury that defendant was *legally* insane. These instructions are in conflict. To instruct the jurors to return a verdict of guilty of murder in the first degree if the State has satisfied them beyond a reasonable doubt that defendant intentionally killed the deceased after premeditation and deliberation but *not* if defendant has satisfied them that he was legally insane, is illogical and can only lead to confusion.

When insanity is pleaded as a complete defense to the charge of murder in the first degree, in which proof of a "willful, deliberate and premeditated killing" is essential, and the commission of the homicide by defendant is judicially admitted, the first issue is whether, *by reason of his insanity*, defendant is not guilty of the crime charged or of any lesser included criminal offense. If the jury finds that defendant was insane,

---

State v. Cooper

---

the prosecution fails completely and further consideration becomes unnecessary.

In the absence of a judicial admission that defendant committed the homicide, it would be appropriate to submit as the first issue an issue worded substantially as follows: "Did the defendant kill the deceased?" The burden of proof rests upon the State to establish beyond a reasonable doubt the affirmative of such issue. A negative answer would end the case. If answered in the affirmative, the jury would consider a second issue worded substantially as follows: "If so, was defendant insane when the killing occurred?" Upon this issue, the defendant would have the burden of proving to the satisfaction of the jury that this issue should be answered "Yes". An affirmative answer to this issue would end the case. If answered in the negative, instructions appropriate to a prosecution in which insanity is not pleaded as a complete defense would be applicable.

In this jurisdiction, there has been no requirement that a defendant specially plead insanity as an affirmative defense. In *State v. Potts,* 100 N.C. 457, 460, 6 S.E. 657, 658 (1888), the defendant, when arraigned, answered: "I admit the killing, but was insane at the time of the commission thereof; therefore, not guilty." The trial judged rejected as irrelevant and surplusage all portions of tendered plea execpt the words "not guilty." Holding this ruling "was entirely proper," this Court stated that, under the plea of not guilty, "every defense to the charge, in repelling, or mitigating and reducing the offense to a lower grade, was admissible." *Accord, State v. Nall,* 211 N.C. 61, 188 S.E. 637 (1936), which quotes with approval the above statement in *Potts.*

In *Nall,* the defendant, when arraigned, entered a general plea of not guilty. After testifying that the fatal shot was fired by another person, the defendant, through counsel, announced to the court that he pleaded insanity, his plea of not guilty being based "first, upon the ground that he did not commit the act, and, second, upon the ground that if the jury should find he committed the act, that he was not responsible for the reason that he was insane." *Cf. State v. Sandlin,* 156 N.C. 624, 626, 72 S.E. 203, 204 (1911).

*Nall* is cited in *State v. Johnson,* 256 N.C. 449, 452, 124 S.E. 2d 126, 128 (1962), but solely with reference to rulings on evidence.

There is no reason why a defendant may not enter simultaneously a general plea of not guilty and a plea of not guilty by reason of insanity. A plea of not guilty by reason of insanity does not *per se* constitute an admission of any of the elements necessary to be established by the State beyond a reasonable doubt as a prerequisite to a verdict of guilty. But *cf. State v. Bowser,* 214 N.C. 249, 254, 199 S.E. 31, 34 (1938), in which the decisions cited do not seem to support certain of the statements in the opinion.

In *State v. Swink,* 229 N.C. 123, 125, 47 S.E. 2d 852, 853 (1948), Ervin, J., restated the rule in this jurisdiction as follows: "[A]n accused is *legally insane* and *exempt from criminal responsibility* by reason thereof if he commits an act which would otherwise be punishable as a crime, and at the time of so doing is laboring under such a defect of reason, from disease of the mind, as to be incapable of knowing the nature and quality of the act he is doing, *or,* if he does know this, incapable of distinguishing between right and wrong in relation to such act." (Our italics.) Subsequent decisions of this Court are in strict accord: *See State v. Potter,* 285 N.C. 238, 249, 204 S.E. 2d 649, 656-57 (1974), and cases cited.

When a defendant in a criminal case pleads insanity, the applicable rule with reference to the burden of proof on this issue has been well stated as follows: "Since soundness of mind is the natural and normal conditions of men, everyone is presumed to be sane until the contrary is made to appear. This presumption of sanity applies to persons charged with crime, but it is rebuttable. [Citations omitted.] These considerations give rise to the firmly established rule that the burden of proof upon a plea of insanity in a criminal case rests upon the accused who sets it up. But he is not obliged to establish such plea beyond a reasonable doubt. He is merely required to prove his insanity to the satisfaction of the jury. [Citations omitted.]" *State v. Swink, supra* at 125, 47 S.E. 2d at 853.

Prior to the enactment of Chapter 85, Public Laws of 1893, our statute relating to murder and its punishment provided: "Every person who is convicted, in due process of law, of any wilful murder of malice pretense, shall suffer death." Chapter 25, Section 1057, Code of 1883. Under the Act of 1893, now codified as G.S. 14-17, "[a] murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, tor-

tue, or by any *other* kind of willful, deliberate and premeditated killing . . . shall be deemed to be murder in the first degree. . . . " (Our italics.) The intent and effect of the 1893 Act are discussed in *State v. Benton,* 276 N.C. 641, 657, 174 S.E. 2d 793, 803-04 (1970).

This dissent herein relates solely (1) to homicide cases in which proof beyond a reasonable doubt of a specific intent to kill, formed after premeditation and deliberation, is prerequisite to a conviction for murder in the *first* degree, and (2) to those homicide cases in which there is substantial evidence that at the time of the homicide defendant had been and was suffering from a recognized serious mental disease and engaged in abnormal behavior characteristic of such disease. If such evidence fails to satisfy the jury that defendant was *insane* under the rule approved by this Court and therefore completely exempt from criminal responsibility, is such evidence competent for consideration by the jury in determining whether at the time of the alleged homicides he was capable of forming a premeditated and deliberate intent to kill, and whether he did so? If so, was defendant entitled to an instruction to that effect?

Defendant assigns error in the court's charge "for that nowhere in the charge did the court instruct the jury that it should consider the evidence of the defendant's mental disease on the matter of premeditation and deliberation." This assignment presents a serious question, apparently one of first impression in this jurisdiction. A similar question has been considered in homicide cases in which proof of a specific intent to kill, formed after premeditation and deliberation, is prerequisite to conviction for murder in the first degree, and there is substantial evidence the defendant was intoxicated when the crime was committed.

Although voluntary drunkenness is not a legal excuse for crime, when a specific intent to kill, formed after premeditation and deliberation, is an essential element of the first degree murder for which defendant is prosecuted, the fact of intoxication may negate the existence of that intent. *State v. Propst,* 274 N.C. 62, 71-72, 161 S.E. 2d 560, 567 (1968), and cases cited; *State v. Bunn,* 283 N.C. 444, 458, 196 S.E. 2d 777, 787 (1973), and cases cited. In *State v. Murphy,* 157 N.C. 614, 72 S.E. 1075 (1911), Hoke, J. (later C.J.), states: "[S]ince the statute dividing the crime of murder into two degrees [G.S. 14-17] and in cases where it becomes necessary, in order to convict an offender

State v. Cooper

of murder in the first degree, to establish that the 'killing was deliberate and premeditated,' these terms contain, as an essential element of the crime of murder, 'a purpose to kill previously formed after weighing the matter' (S. v. Banks, 143 N.C. 658; S. v. Dowden, 118 N.C. 1148), a mental process, embodying a specific, definite intent, and if it is shown that an offender, charged with such crime, is so drunk that he is utterly unable to form or entertain this essential purpose he should not be convicted of the higher offense."

Although a number of jurisdictions adhere strictly to the view that insanity is either a complete defense or no defense at all, the weight of authority now supports the proposition that mental disease short of legal insanity may be considered in determining whether the accused at the time of the alleged homicide was capable of forming a premeditated and deliberate intent to kill, *and whether he did so.* Pertinent *earlier* decisions are cited and classified in a footnote to the opinion of Justice Reed in *Fisher v. United States,* 328 U.S. 463, 473-74, 90 L.Ed. 1382, 1389, 66 S.Ct. 1318, 1323-24 (1946).

In at least three jurisdictions, earlier decisions holding a person is either legally sane and therefore wholly responsible for all his acts, or insane and wholly irresponsible, have been overruled: *United States v. Lee, 4 Mackey* (DC) 489, 54 Am. Rep. 293 (1885), and District of Columbia cases in accord, were overruled in *United States v. Brawner,* 471 F. 2d 969 (1972) ; *People v. Troche,* 206 Cal. 35, 273 P. 767 (1928), *app. dismd.* 280 U.S. 524, 74 L.Ed. 592, 50 S.Ct. 87 (1929), and California cases in accord, were overruled in subsequent California decisions including *People v. Henderson,* 60 Cal. 2d 482, 35 Cal. Rptr. 77, 386 P. 2d 677 (1963) ; *State v. Maioni,* 78 N.J.L. 339, 74 A. 526, 20 Ann. Cas. 204 (1909), and New Jersey cases in accord, were overruled in subsequent New Jersey decisions including *State v. Vigliano,* 43 N.J. 44, 202 A. 2d 657 (1964).

Later decisions are cited in footnotes 55 through 67 in *United States v. Brawner, supra,* at 1000-1001, and in Comment Note, 22 A.L.R. 3d 1228, § 7, at 1246. The A.L.R. Comment Note follows the report of *People v. Goedecke,* 65 Cal. 2d 850, 56 Cal. Rptr. 625, 423 P. 2d 777, 22 A.L.R. 3d 1213 (1967). As indicated, a substantial majority of these decisions support the proposition that evidence of mental disease short of legal insanity is competent for consideration in determining whether the accused at the time of the alleged homicide was capable of

forming a premeditated and deliberate intent to kill, and whether he did so. The decisions referred to below will suffice to indicate the present majority view.

In *Becksted v. People,* 133 Colo. 72, 292 P. 2d 189 (1956), this question was presented: "[U]pon trial of the issues raised under the 'not guilty' plea is accused entitled to introduce all competent evidence, including that of experts, which is relevant to the question of whether he lacked the mentality to form the specific malicious intent which is an essential ingredient in the crime of first degree murder, namely, the specific intent deliberately and premeditatedly to unlawfully take the life of another?" This question was answered in the affirmative.

In *State v. Green,* 78 Utah 580, 6 P. 2d 177 (1931), the opinion states: "If the appellant was so afflicted with insanity that he was 'mentally incapable of deliberating or premeditating, and to entertain malice aforethought, and to form a specific intent to take the life of the deceased, in such event the jury should not find him guilty of murder in the first degree.' The language just quoted is the law announced by this court in the case of *State v. Anselmo,* 46 Utah 137, 148 P. 1071. While the defense urged in the Anselmo Case was intoxication, the law there announced is equally applicable where, as here, the defense of insanity is made an issue."

In *State v. Padilla,* 66 N.M. 289, 347 P. 2d 312, 78 A.L.R. 2d 908 (1959), a new trial was awarded because the court failed to instruct the jury that evidence of the defendant's mental condition and defects was competent for consideration in determining whether defendant had the mental capacity to deliberate the killing. The court noted that its holding was not based on a doctrine of "diminished" or "partial" responsibility. In explanation of the basis therefor, the opinion states: "[I]t means the allowing of proof of mental derangement short of insanity as evidence of lack of deliberate or premeditated design. In other words is contemplates full responsibility, not partial, but only for the crime actually committed." Too, the opinion, after referring to New Mexico decisions similar to our *State v. Propst, supra,* continues: "[T]he question immediately arises as to why there should be a different rule and perhaps a more lenient one with respect to a user of alcohol or drugs than in the case of one who may be afflicted with a mental disease not of his own making. If alcohol or drugs can legally prevent a person from truly

deliberating, then certainly disease of the mind, which has the same effect, should be given like consideration."

In *State v. Gramenz,* 256 Iowa 134, 126 N.W. 2d 285 (1964), the defendant was convicted of murder in the second degree. The Supreme Court of Iowa approved the trial court's instruction which, under the facts of the case, permitted the jury to consider evidence of defendant's mental condition on the issues of willfulness, deliberation and premeditation, but rejected defendant's contention that the jury should have been allowed to consider the evidence of defendant's mental condition on the elements of malice aforethought and general criminal intent.

Under the present California rule, a person who is suffering from a mental disease that prevents his acting with premeditation and deliberation is not guilty of murder in the first degree. Moreover, when the court is sufficiently advised that the defendant is relying upon evidence of such mental disease to negate the elements of premeditation and deliberation in first degree murder, the court is required without request therefor to instruct the jury as to the legal significance of such evidence. *People v. Henderson, supra.* It was so held in New Jersey in *State v. Vigliano, supra.*

In addition to the abnormal behavior of defendant herein, all of the medical testimony tends to show defendant had been and was suffering from paranoid schizophrenia which, at the time of the homicides, was in a state of exacerbation. Under these circumstances, not withstanding the absence of a specific request therefor by defendant's counsel, it is my view that defendant was entitled to instructions that this evidence was for consideration by the jury in determining whether the State had proven that the homicides were committed pursuant to a specific intent to kill, formed after premeditation and deliberation. *See State v. Propst, supra.*

*Certain* of the cases cited as adhering strictly to the view that "a person is either 'sane' and wholly responsible for all his acts, or 'insane' and wholly irresponsible," Weihofen, Mental Disorder as a Criminal Defense, at 177-78 (1954), involved factual situations in which this Court would reach a like *result.* For example, in *State v. Flint,* 142 W. Va. 509, 96 S.E. 2d 677 (1957), it was held that the trial court properly excluded the proffered testimony of a psychiatrist to the effect that his examination of defendant disclosed that defendant's "mental

age" was not greater than that of an average person of the age of "ten years and eleven months." Under our decisions such evidence of low mentality would not be competent to establish legal insanity, *State v. Shackleford,* 232 N.C. 299, 59 S.E. 2d 825 (1950), or to negate the elements of premeditation and deliberation in first degree murder, *State v. Scales,* 242 N.C. 400, 87 S.E. 2d 916 (1955). The evidence herein with reference to defendant's mental disease and abnormal behavior characteristic thereof is quite different from testimony tending to show "low mentality."

As stated above, the rule urged herein relates solely (1) to homicide cases in which proof beyond a reasonable doubt of a specific intent to kill, formed after premeditation and deliberation, is prerequisite to a conviction for murder in the *first* degree, and (2) to those homicides in which there is substantial evidence that defendant was suffering from a recognized serious mental disease and engaged in abnormal behavior characteristic of such disease. The record here discloses that defendant had been and was a chronic sufferer from paranoid schizophrenia, described by all experts as a serious mental disease of psychotic depth and when in exacerbation characterized by abnormal conduct resulting from hallucinations and delusions.

In my view, there was ample medical and circumstantial evidence from which the jury could have found that, at the time of the homicides, defendant's disease was in relapse; that he was experiencing an active schizophrenic process, characterized by both visual and auditory hallucinations; and that he was out of touch with reality. It was Dr. Maynard who testified upon cross-examination, "I do know and it is my opinion as an expert that an active schizophrenic process can well result in the commissions of acts of violence over which the person who is mentally ill has no control. I thought this was possible in the case of Albert Cooper."

For the reasons stated, I vote for a new trial.